[No. S073596. May 24, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW LANCASTER, Defendant and Appellant.

54

---

---

**COUNSEL**

Roger Teich and David Groom, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**CORRIGAN, J.**—A jury sentenced defendant Andrew Lancaster to death, after finding him guilty of first degree murder and kidnapping for purposes of extortion. The jury found true the special circumstance allegation that the murder was committed during the commission of a kidnapping, and also found that defendant personally used a firearm. This appeal is automatic.

## I. FACTUAL BACKGROUND

### A. *Guilt Phase*

The victim, Michael Taylor, was a former reporter and producer for radio station KPFK in Los Angeles. After leaving KPFK, he planned to start an unlicensed microwave radio station along with Robert Marston and Tyrone Floyd (who were also former KPFK employees). In January 1996, Taylor told Marston and Floyd that he had found a financial backer named Mzee Shambulia. Marston ordered equipment for assembling a transmitter, an amplifier, and an antenna. He used his own money, having received no funding from Shambulia. The parts for the amplifier did not arrive until mid-April.

Defendant, who went by the name "Hodari Lumumba," was an associate of Shambulia. He attended several meetings between Shambulia and Taylor's group in early 1996. At one of those meetings, Shambulia pulled Marston aside and asked him if the equipment was going to be delivered on time. Marston told him that he was having some trouble, but could arrange for a loan of equipment if necessary. Shortly after this meeting, Taylor called Marston and referred to a $2,000 payment he thought Shambulia had given to Marston to buy equipment. Marston had not received that payment, and he expressed a "high degree of anxiety" to Taylor. Taylor assured him he would correct the situation, and in a subsequent phone call said he was seeking alternative financing.

Marston and Taylor became more concerned when Shambulia showed Taylor a site for installing the station's equipment that Taylor considered a "phony location." After that, Marston decided not to deliver any equipment to Shambulia's group. Taylor and Floyd were also troubled by Shambulia's plan to sell commercial air time on the station. Taylor and Floyd were contemplating a "people's radio station" funded by donations. They wrote Shambulia what Floyd described as "basically . . . a Dear John letter saying we [were] going to keep the microwave station, that we had the transmitter and we were going to start our own station and they were welcome to do whatever . . . ."

At some point, Shambulia did give Marston a money order for $220. Marston returned the money order by registered mail on Friday, April 19. Taylor then received a phone call informing him that Shambulia was extremely angry. On April 21, Taylor told Marston that defendant had telephoned, saying to tell Marston that "if they don't get their equipment, things are going to get rough." The same day, Taylor told Floyd that defendant had "stated that if he didn't get the transmitter back, that it would get nasty."

Floyd testified that Taylor was quite frightened after defendant's warning. On the afternoon of April 21, Taylor and Floyd went to a party together. Floyd noted at one point that Taylor was so nervous he was shaking. The next day, Floyd spoke with Taylor twice about their plans for the station. During the first call, around 8:00 p.m., Taylor was excited about the project. Around midnight, however, Floyd received a call from Taylor that he described as "very strange." Taylor asked him to call some social activists in Philadelphia. Floyd was puzzled, both because it was odd for Taylor to call that late and because his request to call people in Philadelphia made no sense. Floyd said Taylor's demeanor was unusual, and different from their earlier conversation.

Floyd and Taylor were to meet the next morning, but Floyd was unable to reach Taylor by telephone. He went to see Taylor, and noticed his car was gone. He called and paged Taylor repeatedly. In the evening, he got a call

from someone who hung up when he answered. Floyd called back using the "star 69" function. The person who answered said he or she had heard Floyd was trying to start a radio station, and offered to come to his house with a $3,000 donation. Floyd refused to disclose where he lived, but agreed to meet the person at a coffee shop. When he arrived, Floyd recognized defendant's car parked on the street, and saw a man wearing a baseball cap sitting in the car.

Floyd went to the front of the coffee shop and made a telephone call. When he hung up and turned around, defendant was standing a foot or two away, wearing a baseball cap. Defendant looked from side to side and moved his index finger back and forth near his belt, where Floyd saw a bulge that appeared to be a gun. Floyd asked defendant when he had last seen Taylor. Defendant "froze" and said he had seen him that day at a homeless center. Floyd left quickly and moved his family to a safe place. The next day, he filed a missing person report for Taylor. Shortly thereafter, he learned that Taylor had been killed.

The events immediately preceding the murder were related primarily through the testimony of defendant's accomplices, Shawn Alexander and Jornay Rodriguez.[1] Alexander was 19 years old in April 1996. He became friends with defendant in 1996, and visited Taylor's house several times with him. On April 21, defendant told Alexander that Shambulia was going to pay defendant to kill Taylor. Alexander would get $1,000 for helping. Nevertheless, the next day when defendant asked him to help pick up some stereo equipment from Taylor, Alexander said that he thought he would only be loading the equipment into defendant's car. Defendant, Rodriguez, and Alexander went together to see Taylor. Alexander had known Rodriguez for a long time, and had introduced him to defendant.

Taylor was not home when they arrived. When they returned around midnight, Alexander remained in defendant's car while Rodriguez and defendant went inside. They came back with Taylor in 10 or 15 minutes. Defendant had a gun, which Alexander described as a nine-millimeter. Rodriguez and Taylor got into Taylor's car, while defendant returned to his own car. Defendant told Alexander they would follow Taylor, and that Taylor "was going down that night." Defendant followed Taylor's car to a secluded area near some train tracks.

When they arrived, defendant told Alexander they would be "paid for this." Defendant took a rope, a container of liquid, and duct tape from his trunk; he

[1] Alexander and Rodriguez were originally charged as codefendants. Before trial, Alexander pleaded guilty to manslaughter and accepted an offer of a 15-year prison term in exchange for his testimony. Rodriguez pleaded guilty to first degree murder, and understood he was to be sentenced to a term of 25 years to life.

also had his gun. The four men walked to a spot near the tracks, and defendant asked Taylor where the equipment was. Taylor did not reply. Defendant asked another question, and angrily pushed Taylor to the ground. After making another inquiry, defendant threw liquid from the container onto Taylor's face. Taylor shook his head, as if his eyes were burning. Defendant told Alexander to tape Taylor's mouth. Alexander tried, but the tape slipped. After looking at Taylor's face, Alexander said he could not do it. Rodriguez tied Taylor up. Defendant had his gun drawn; Alexander did not see Rodriguez with a gun.

Defendant told Alexander to check Taylor's pockets. Alexander took a pager, a pack of cigarettes, and a lighter from Taylor. Defendant told Taylor he would ask one last time where the equipment was. When Taylor said that Floyd had it, defendant responded, "you lied to me." He then gave his car keys to Alexander and Taylor's keys to Rodriguez, and told them to meet him at his house, which was nearby. As Alexander walked away, he heard several gunshots. He turned and saw defendant holding the gun.

Alexander went to defendant's house, and defendant drove him home. Alexander asked why defendant shot Taylor. Defendant said only that Taylor had tried to get up, and he shot him in the head and chest. Alexander kept Taylor's pager. Several days later, defendant inquired about it, and Alexander told him he had been "cutting off the number" when he received pages. Defendant said that was a stupid thing to do, because he needed some information. He told Alexander he was going to call the numbers on the pager.

Rodriguez was about 20 years old on April 22, 1996. He had known defendant for less than a month. He did not know why they were visiting Taylor, whom he had never met, but he went with defendant into Taylor's house. Rodriguez did not recall the initial conversation, but said that eventually defendant raised his shirt, exposing a nine-millimeter gun, and told Taylor, "we're going to take a little ride." Taylor was speaking on the telephone at that point. After Taylor hung up, defendant demanded to know where "the radio equipment" was. Taylor said nothing, and left the house with Rodriguez and defendant walking behind him.

One of Taylor's housemates testified that as she left her room on the night of April 22, 1996, she saw Taylor on the phone in his room with two men facing him. She waved to him, but he did not respond, which was unusual. She was downstairs when the three men left the house. She saw them go out together and heard Taylor's car driving away.

Rodriguez testified that defendant told him and Taylor to get into Taylor's car, and instructed Taylor where to drive. Defendant went back to his car.

Rodriguez pointed a .25-caliber automatic handgun as Taylor drove. When they reached their destination, Rodriguez put his gun away. Defendant had his gun out, and pushed Taylor toward a mound of dirt. Defendant was asking about the radio equipment. Taylor was saying, "let's talk about this . . . we don't need to do this." Defendant splashed some liquid into Taylor's face. Rodriguez gagged Taylor with duct tape, and bound his hands and legs. After Rodriguez took Taylor's keys, he and Alexander walked away. Rodriguez heard two or three gunshots, then drove away in Taylor's car.

A day later, Rodriguez met defendant at Alexander's house; they did not discuss the killing. Subsequently, the three met with Shambulia. Defendant told Shambulia what had happened to Taylor, saying "it was about the radio equipment." On another occasion, defendant went to Shambulia's house and returned with a check, saying, "I got the money." Rodriguez understood the payment was for killing Taylor, but he did not know how much the check was for. Rodriguez was never given any money, though defendant had promised to pay him.

At 12:35 on the morning of April 23, 1996, Los Angeles police officers arrived at the crime scene. A witness who had heard gunshots directed them to the body. Taylor's hands and legs were bound, and there was duct tape around his neck. An open bottle of Liquid-Plumr lay nearby; it appeared new and still contained some liquid. Taylor's black T-shirt had white stains on the chest and upper back, consistent with the damage that Liquid-Plumr would cause. Three fingerprints and a palm print were lifted from the bottle and matched to defendant.

Four nine-millimeter casings were found near the body, and three nine-millimeter slugs were recovered. All were fired from the same weapon. Taylor sustained gunshot wounds to the face, neck, shoulder, and chest.

Defendant presented no evidence at the guilt phase.

## B. *Penalty Phase*

Taylor's mother, two brothers, and daughter testified about the impact of his murder on them and other family members.

The prosecutor introduced evidence of two other crimes committed by defendant. In 1986, when he was 14 years old, he raped a nine-year-old girl in Maryland. The victim testified that defendant pulled her from her bicycle and forced her into the back of a van, where, with the assistance of an older accomplice, he tried to force her to orally copulate him. He beat her, raped her, and threatened to kill her if she told anyone. The victim said she was

"torn my whole life" as a result of this incident, and had avoided sex altogether. In 1992, defendant and another man conducted a home invasion robbery, leaving the terrified victim bound, gagged, and tied to her mattress.

The jury also heard about two incidents occurring while defendant was in custody after his arrest for Taylor's murder. In December 1997, a sheriff's deputy handcuffed and searched defendant when he refused to return to his cell. A makeshift knife or "shank" was found in his pocket.[2] Defendant told the deputy he had been caught with a shank on three other occasions, but the resulting charges were dismissed each time. In May 1998, another deputy discovered three jail-made handcuff keys, fashioned from small pieces of metal, in defendant's cell.

The defense presented testimony from a clinical and forensic psychologist, Dr. Richard Romanoff. Dr. Romanoff had reviewed defendant's penal and medical records, met with him several times, and conducted various tests. He concluded that defendant has an antisocial personality, characterized by a predisposition toward criminal behavior, deceitfulness, impulsivity, aggressiveness, recklessness, and lack of remorse. Defendant's personality disorder might have a genetic component, and related problems began in his childhood, which was characterized by domestic violence and failure to bond with his parents. He had never received proper intervention; at one point he was part of a National Institutes of Health drug treatment program, but Dr. Romanoff characterized that experience as "mostly being a guinea pig." The doctor believed that although defendant's disorder was difficult to treat, it could be overcome through self-motivation. Defendant's current involvement with Islam was the most likely source of an eventual recovery, in Dr. Romanoff's opinion.

Reverend Richard Byrd was a minister who had a weekly radio program at KPFK. He knew both Taylor and defendant. He had spoken with defendant "fairly often" about spiritual matters, and said defendant had been conscientiously trying to transform his life. He viewed defendant and Taylor as "co-activists," and was shocked to learn that defendant was implicated in Taylor's murder. He had never seen defendant behave inappropriately.

Omar Rashad, an imam at a Los Angeles mosque, became acquainted with defendant while visiting the jail, and helped him "with his growth and development in the religion of Islam." Defendant demonstrated a sincere commitment to Islam, asking serious questions and responding to counseling. The imam was unaware of any acts of violence by defendant.

---

[2] Hereafter, we adopt the terminology used by the parties and refer to this implement as a shank.

Defendant testified, accusing the witnesses against him of lying. He did not trust attorneys or psychiatrists. He said he would not ask the jury to spare his life because only God can give life. Defendant disparaged Dr. Romanoff's testimony, telling the jury, "this antisocial syndrome bull stuff, don't fall for that." He professed his innocence, claiming it was Shambulia who had a confrontation with Taylor. Defendant said their differences were over politics, and had nothing to do with himself or the radio station. On cross-examination, defendant admitted telling Taylor that "things would get rough" if Shambulia did not get his equipment, but claimed he was merely passing along a message from Shambulia. The prosecutor questioned defendant at length about statements he gave to the police.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Defendant's Legal Representation*

Defendant contends the trial court erred by undermining his effort to represent himself, denying his request to appoint an attorney of his choice, and denying that attorney's motion for the appointment of second counsel. His claims require a discussion of the underlying circumstances at some length.

##### a. *Background*

On May 23, 1996, defendant appeared in municipal court to enter a plea and set his preliminary hearing. Although accompanied by a public defender, defendant asked to represent himself. The court granted the request after warning him about the disadvantages of self-representation, as required by *Faretta v. California* (1975) 422 U.S. 806, 835 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).

At the outset of a hearing on June 6, defendant reaffirmed his desire to represent himself. Later in the hearing, however, he moved for the appointment of counsel. When the court told him "you can't have it both ways," defendant asked for an in camera hearing, but the court continued the matter. At a hearing on June 13, defendant requested the appointment of Rowan Klein as his co-counsel. The court denied the motion without prejudice, explaining that defendant had not made a sufficient showing for the appointment. The court did appoint an investigator and legal runner. On June 25, defendant appeared in court and declared, "I want to keep my pro per status." The preliminary hearing was set for July 23.

At a hearing on July 1, 1996, defendant was present when the district attorney made a record of the discovery she had provided to him. On July 23, defendant appeared for the preliminary hearing with Attorney Michael Artan. Artan told the court that defendant did not feel competent to go forward and wanted Artan to represent him, but had not paid Artan. The court noted that defendant had repeatedly expressed his desire to represent himself, and never indicated he would be unable to proceed. Defendant told the court, "I feel very uncomfortable right now, and I'm not prepared to proceed today." He also said he had not received full discovery. The prosecutor responded that defendant had received all discovery pertaining to Floyd, the witness who was appearing that day. The hearing went forward, with defendant representing himself.

Defendant was arraigned in superior court on August 6, 1996. Artan appeared and was permitted to assist defendant with the arraignment. The court gave defendant the forms he needed to complete to proceed in propria persona, and set a hearing for August 9 to resolve the question of Artan's status. At that hearing, defendant told the court he needed an attorney but had a conflict with the public defender's office. Defendant felt his public defender had been incompetent, overworked, and disrespectful. Even if another public defender were appointed, defendant believed "I couldn't get justice with that." He had not hired Artan, and could not afford to. He requested appointed counsel.

The court explained that it was required to appoint the public defender, who would then determine whether there was a conflict. Artan said he did not believe the public defender's office had conducted a conflict check, but he suspected there was a conflict. Artan had met with defendant approximately 10 times, spent about 50 hours on his case, and believed they had developed a level of trust. Defendant had asked Artan to seek appointment as defense counsel. Artan conceded he was not on the panel of qualified capital defense attorneys. However, he said he met some of the criteria and suggested the court had discretion to appoint him. He recommended that the court have the public defender do a conflict check, then consider appointing him upon a written application.

The court said it would entertain such a motion, but noted that Artan's appointment was problematic because he was not on the qualified panel, and because the public defender could not do a conflict check unless defendant permitted the public defender to be appointed. The court asked whether defendant would give up his right to represent himself. After conferring with Artan, defendant said that if it was "not appropriate right now" for Artan to be appointed, he wanted to remain in propria persona. The court reviewed the forms submitted by defendant and gave him *Faretta* warnings.

Artan told the court he would do what he could to ascertain whether the public defender's office had a conflict. The court approved, but noted again that Artan's chances of appointment were poor because he was not on the qualified panel. The court also explained to defendant that standby counsel would be appointed, for the sole purpose of taking over "if something happens to your pro per status." Standby counsel would not interfere with defendant's handling of the case, though defendant could request consultation and "it will be up to the trial judge of your case to determine with you how you want the standby counsel to relate to your case." Defendant said he understood.

On September 10, Ron Rothman appeared with defendant as appointed standby and advisory counsel. Rothman said he expected defendant to abandon self-representation and accept him as his attorney, but said he would like defendant to remain in propria persona "temporarily," because it was "enabling me to establish a rapport with him." Rothman had visited defendant several times in jail. He asked for "a full set of discovery." The prosecutor expressed concern whether she would be dealing with Rothman or defendant, and noted that defendant had already wavered on the question of his legal representation. She said her office had not yet decided whether to seek the death penalty, and suggested waiting to decide the discovery issue until that question, and Rothman's status as counsel, were resolved. The court pointed out that even standby counsel would need discovery. Defendant agreed that for the time being, the prosecutor could turn over discovery materials to Rothman.

At a trial-setting conference on October 16, Rothman appeared as standby and advisory counsel. Defendant reaffirmed his desire to represent himself. The prosecutor reported that no decision regarding penalty had been reached, and repeated her concern about the uncertainty over defendant's representation. On November 26, the prosecutor announced that she would seek the death penalty. Rothman was present, but defendant told the court he had found another attorney to act as advisory and standby counsel. The court informed him that he could not "just substitute someone else in." Defendant then said that he had privately retained Artan to "take over this case," and assured the court that Artan's fee had "all been taken care of." Artan came late to the hearing, and told the court that he had not been paid, but was nevertheless "on the case." The court relieved defendant and Rothman of their status as counsel. Rothman agreed to turn over all case materials to Artan.

Artan appeared for pretrial hearings in December 1996 and February, April, and May 1997. On May 29, the court indicated it wanted to begin trial in August. Artan was concerned about his readiness. He explained that he had

been in trial, was a sole practitioner, and was still receiving discovery from the prosecutor. The court warned that trial could not be delayed for counsel, and that Artan could be relieved if he were unable to prepare. Artan thought he could be ready in September. He noted that although he was retained, he was not being paid.

On July 7, Artan again expressed reservations about his preparation, even for a trial in September. He had other cases that were scheduled for trial soon, and conceded that if he were being paid he might not have taken them. He mentioned the possibility of appointing co-counsel. The court was not receptive to that idea and said it was inclined to relieve Artan. Defendant objected, saying he and Artan had a good relationship. He felt he could not receive a fair trial with an attorney appointed from the qualified panel. The court accommodated defendant's desire for Artan to remain as counsel, and set September 22 as the trial date.

On August 29, it was evident that Artan's problems with preparation persisted. He had filed an application for the appointment of second counsel, which would be heard by another judge. The court suggested it was unlikely the application would be granted, and again mentioned the possibility of replacing Artan.

In the application for appointment of co-counsel, Artan declared that defendant was indigent, Artan was a sole practitioner with four cases set for trial before defendant's, substantial work remained on defendant's case, and this was Artan's first capital case, necessitating extra preparation time. Artan noted that appointment of second counsel was authorized by *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]. He argued that an unusual circumstance justified his application. Because he was not being compensated by public funds, the county would be paying no more than it would for a single appointed counsel.

The court denied the application on September 8, ruling that Artan had failed to provide any specific or compelling justification. The court stated that the application raised questions regarding Artan's ability to handle defendant's case, given his other commitments and inexperience. It directed Artan to bring these concerns to the trial court's attention.

On September 17, 1997, Artan told the trial court he would seek reconsideration of his application. In that motion, Artan argued that the case was a complex one. He noted that the prosecution intended to present evidence of four felonies in Maryland, which had occurred in 1986 and 1987, and that defendant's prison records reflected psychological conditions that "may require motion practice." Artan also suggested that his inability to handle the

case alone was itself a compelling justification for additional counsel. On September 22, Artan told the court he anticipated seeking writ relief if his motion failed. The court told Artan that if he was unsuccessful, he would be relieved.

The motion for reconsideration was denied on October 9. The court found that defendant's case was not "complex or voluminous," and concluded that Artan's busy schedule and inexperience were not grounds for the appointment of second counsel. The Court of Appeal denied Artan's writ petition challenging the court's ruling.

On November 26, Artan informed the trial court that he would have to withdraw, and that defendant hoped to have someone appointed in his place. The court allowed Artan to withdraw but asked him to remain on the case until successor counsel could be appointed. The court also told defendant it would investigate his claim that his legal materials had been confiscated in jail. On December 1, the court reappointed the public defender.

On December 3, the public defender reported that his office had not yet completed a conflict check. Defendant was unhappy with the public defender's appointment, expressed a desire "to hurry up and get this case to trial so I can get it over with," and again asked to represent himself. The court advised defendant to wait for the result of the conflict check. Defendant was concerned that even if alternate counsel were appointed, he might not be able to work with that attorney, and said he would prefer to "put my life in my own hands." When asked if he wanted to represent himself even if he received appointed counsel, defendant said yes. The court granted his request, again giving him *Faretta* warnings. Defendant complained about his missing legal materials; the court assured him that they would be returned. The court directed Artan to return his discovery materials to the prosecutor so she could itemize what she would be turning over to defendant.

On December 17, Ron Rothman appeared as standby counsel. Defendant's in propria persona privileges in jail had been revoked after he was found with a shank. Defendant asked for temporary suspension of his in propria persona status so that Rothman could represent him for a hearing on the shank incident. The court agreed. Defendant conceded his possession of the shank, contesting only the restrictions on his privileges. A deputy from the jail explained that defendant could not visit the library and his movements in jail would be restricted, but he could meet with advisory counsel and a licensed investigator. He could see witnesses during regular visiting hours, and would have limited telephone access.

Defendant said he was concerned not so much with the telephone as with the ability to keep his legal materials private; he also complained that he still

had not received all the confiscated material and was concerned that their contents might become known. The court told defendant that any jailhouse informants who had invaded his privacy would not be allowed to testify. It refused to interfere with the jail's security measures, but obtained the deputy's assurance that defendant would have access to his legal materials. The court agreed to appoint a legal runner, order telephone access, and direct the return of defendant's legal materials.

On January 8, 1998, defendant appeared and reconfirmed his desire to proceed in propria persona with Rothman as standby counsel. Rothman said that defendant had led him to believe that he would turn over the defense to Rothman. Rothman had prepared motions, but could not present them now that defendant had kept him on standby status. Rothman also explained that Artan's attempt to return the case materials to the district attorney had been unsuccessful due to a delivery problem. Rothman agreed with the court's suggestion that he follow up personally with Artan.

Defendant moved for sanctions based on the continued failure to return his legal materials. The court told defendant that problems with lost materials in jail were not unusual, and promised to do what it could to have his returned, or to "regenerate" them to the extent possible. Defendant noted that the jail had placed him with other in propria persona inmates, but he was still not allowed to go to the law library. He asked to be placed in a special module where he would be searched going in and coming out, to resolve the security problem. The court noted defendant's failure to make this request at the last hearing when representatives from the jail were present. It declined to revisit the question of his jail privileges. It also reminded defendant of its previous admonitions on the disadvantages of self-representation, including the limitations that his custody status would impose.

On January 22, defendant reported that all his materials had been returned, and dropped his sanctions motion. Defendant then told the court: "Your Honor, I would desire to give up my pro per status and have Mr. Rothman represent me." The court expressed some uncertainty over whether Rothman could properly do so, because the last time defendant relinquished self-representation the master calendar court had reappointed the public defender. However, the court ultimately agreed to Rothman's appointment, observing that the case needed to "move faster." It warned defendant that he could not keep alternating between self-representation and appointed counsel. Defendant replied that he understood.

b. Faretta *Claims*

Defendant contends his rights to due process and self-representation under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution were

violated when the trial court "compelled" him to relinquish his in propria persona status by (1) permitting the jail authorities to confiscate his legal materials; (2) permitting the prosecutor and defense counsel to withhold discovery; (3) improperly overruling objections and restricting defendant's questioning at the preliminary hearing; (4) denying him access to the law library, telephone, witnesses, and special jail housing; (5) denying him the effective assistance of advisory counsel; and (6) disparaging his decision to represent himself.

Because defendant never made this claim below, it is questionable whether he may properly raise it now. (*People v. Jenkins* (2000) 22 Cal.4th 900, 999–1000 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) In any event, the claim is meritless. The record reflects no compelled abandonment of self-representation. Defendant relinquished his right to self-representation without prompting from the court, just after the jail authorities returned his legal materials.

Defendant's claims of incomplete discovery are groundless. He refers to matters withheld by the prosecutor in advance of the preliminary hearing. At a July 16, 1996 hearing held in defendant's absence, the prosecutor explained that she had not turned over witness names and addresses. She had also withheld tapes and statements by Alexander and Rodriguez implicating defendant. Although they were housed separately from defendant, she was concerned about retaliation by other members of Shambulia's organization. The court found good cause for withholding this material, under Penal Code section 1054.7. Defendant does not challenge the propriety of that finding. Defendant also complains of the delay in obtaining discovery material from Artan after he withdrew. However, the court consistently sought to make practical arrangements for the return of that material.[3]

Defendant refers in passing to evidentiary rulings at the preliminary hearing. However, he offers no legal argument regarding these rulings. If any were improper, he fails to explain how they might have affected his right to represent himself.

After defendant lost his law library privileges because of his possession of a weapon, the court ensured that he had advisory counsel and a legal runner.

---

[3] Rothman offered two explanations for the delay. Artan had told Rothman that he sent the discovery material to the prosecutor, but FedEx returned it because they could not locate her. Rothman also told the court he believed Artan thought some of the material was privileged. The court noted that the material could not be given directly to defendant, without first allowing the prosecutor to delete the names and addresses of certain witnesses. Defendant, while he was representing himself, recognized that such redaction was proper. The prosecutor had agreed to perform the necessary review once she received the material from Artan.

He was granted access to witnesses, the services of an investigator,[4] and a telephone. Regarding his housing assignment, the court properly deferred to the jail authorities on security matters, while providing alternate means for legal research and investigation. These measures sufficiently protected his opportunity to prepare a defense. (*People v. Blair* (2005) 36 Cal.4th 686, 733–734 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1001.)

Defendant's claim that he was deprived of Rothman's effective assistance as advisory counsel is based partly on the fact that Rothman did not have the discovery materials during the two months between Artan's withdrawal and defendant's abandonment of self-representation. We have discussed the discovery situation above. In any event, defendant points to no impact on Rothman's ability to provide advice. Defendant also relies on Rothman's January 8, 1998 comment that he had prepared motions in the expectation that defendant would relinquish his own representation, but was unable to present them because defendant wanted to continue with Rothman as advisory counsel. This circumstance in no way supports defendant's claim that he was deprived of the effective assistance of advisory counsel.

Defendant accuses the court of disparaging his right to represent himself. However, several of the remarks defendant complains about were part of the warnings required by *Faretta*. (*Faretta, supra,* 422 U.S. at p. 835; *People v. Blair, supra,* 36 Cal.4th at p. 708.) The others, with one minor exception, were entirely proper under the circumstances of this case. Defendant finds two admonitions particularly objectionable. On January 8, 1998, when defendant complained about the restriction of his library privileges, the court said: "Again, your status is kind of a questionable one. It was made clear to you at the time [when the restrictions were imposed] the limitations you would face as a pro per in the jail, and that's why I suggested and strongly do suggest that you accept appointed counsel to let that counsel act for you. That's the best way to do it.

"Even if you were a trained attorney, you'd be a fool to represent yourself because you're emotionally involved in the issues. And what you've got at your side is an experienced attorney that can do an excellent job for you, but it is your choice under the Constitution."

These comments were appropriate. The court had a duty to remind defendant of the "dangers and disadvantages of self-representation" (*People v.*

---

[4] Defendant complains that there is no record of any bills showing an investigator actually worked on his case. However, there is also no showing that defendant directed an investigator to do anything. The record is clear that the court was consistently willing to provide defendant with the services of an investigator.

*Blair, supra,* 36 Cal.4th at p. 708), and it tailored that advice to defendant's current situation. The court expressly recognized defendant's constitutional right to conduct his own defense. Defendant inaccurately describes the court's comments as suggesting that his *Faretta* right could be revoked based on his misconduct in jail. The court said nothing about revocation; it merely noted that defendant's status in jail entailed some practical limitations.

On January 22, 1998, after defendant relinquished his *Faretta* right and accepted Rothman's representation, the court stated: "I do need to advise Mr. Lancaster that you cannot continue to change between representing yourself and having appointed counsel represent you. The reason for it is that we've got to move forward, and that doesn't allow us to do that.

"I think it's a very wise move on your part, as I said. Even if you were a trained attorney, you still don't have access to the same evidence that Mr. Rothman would have . . . . But having originally had an attorney, gone pro per, had an attorney, gone pro per, now you're back to an attorney, I can't let you continue to change from one to the other. It has to be a permanent decision on your part.

"Even if at some point you have some disagreement with what Mr. Rothman is doing, you can't just say now I'm back pro per. That's a decision for the court to make, and it probably would not be in your favor."

▇ Defendant mischaracterizes these comments as a "preemptive denial" of his *Faretta* right, and fundamental error under *People v. Dent* (2003) 30 Cal.4th 213 [132 Cal.Rptr.2d 527, 65 P.3d 1286]. Under the circumstances, including the court's protracted grappling with the logistics of providing defendant with discovery materials and access to legal resources, the court's concern with his repeated alternation between self-representation and the services of counsel was warranted. A defendant's "prior proclivity to substitute counsel" is a legitimate factor for the court to consider in connection with an assertion of the right to self-representation. (*People v. Roldan* (2005) 35 Cal.4th 646, 684 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) The court's reference to the need for a "permanent decision" was, however, precipitous. Trial was not imminent, and a renewed and timely *Faretta* motion would have been entitled to the court's full consideration. (See *People v. Dent, supra,* 30 Cal.4th at pp. 221–222.) Nevertheless, the court did not entirely foreclose the possibility of defendant's future self-representation; it told him it would make a decision on any renewed application, though the request would probably not be viewed with favor.

In *Dent,* the court erred by unequivocally ruling out the possibility of self-representation. (*People v. Dent, supra,* 30 Cal.4th at p. 219.) Nothing of

the sort occurred here. The court never denied a *Faretta* motion. Defendant exercised and abandoned his *Faretta* right several times. He gave no indication his ultimate decision to accept Rothman's representation was influenced by anything the court had said or done. The record amply demonstrates the difficulties posed by defendant's intermittent assumptions of his own defense. The court's attempt to discourage defendant from perpetuating those difficulties is understandable. While the court should not have warned defendant that he needed to make "a permanent decision" at that point, the impropriety was slight and caused neither fundamental nor prejudicial error.

No authority cited by defendant supports his claim of interference with the right of self-representation. The cases on which he relies involved either outright denial of the right (*People v. Dent, supra,* 30 Cal.4th at p. 219; *Bribiesca v. Galaza* (9th Cir. 2000) 215 F.3d 1015, 1019), or improper restriction on a defendant's ability to present his own defense (*Milton v. Morris* (9th Cir. 1985) 767 F.2d 1443, 1446). Defendant suffered neither of these deprivations.

### c. *Failure to Appoint Artan as Defense Counsel*

Defendant contends that by refusing to appoint Artan, the trial court abused its discretion and deprived him of due process and the right to counsel. However, defendant never properly requested Artan's appointment. When the question arose on August 9, 1996, the court explained that Penal Code section 987.2 required the initial appointment of the public defender. Only if the public defender found a conflict could the court consider appointing other counsel. Artan told the court he would inquire further and make a motion providing the court with "some of the factors that would support my appointment on the case." The court was skeptical but said it would allow Artan to file a motion for his appointment under *Harris v. Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750] (*Harris*).[5]

Defendant decided to proceed in propria persona. Artan never filed a *Harris* motion; instead, he appeared on November 26, 1996, and agreed to represent defendant pro bono. Under these circumstances, defendant cannot now claim error. He does not challenge the court's ruling that it was statutorily required to appoint the public defender and wait for a conflict

---

[5] In *Harris,* this court held that a trial court's discretion in appointing counsel for an indigent defendant when the public defender declares a conflict is not constrained by the defendant's preference for a particular attorney. (*Harris, supra,* 19 Cal.3d at p. 799, reaffirming the rule of *Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934–935 [106 Cal.Rptr. 631, 506 P.2d 1007].) Under the specific and unusual facts presented, however, the *Harris* court concluded that the trial court abused its discretion in declining to appoint the counsel requested by the defendants. (*Harris, supra,* at pp. 795–799.)

check before considering the appointment of alternate counsel.[6] He notes that the court ultimately failed to comply with that requirement, appointing Rothman without any intervening participation by the public defender. However, the fact remains that defendant never objected to the court's view of the statutory scheme, and agreed to continue representing himself while Artan explored the possibility of a *Harris* appointment. That avenue, abandoned below, cannot be reopened on appeal.

### d. *Refusal to Appoint Co-counsel*

Defendant claims the trial court erroneously denied his motion for the appointment of counsel to assist Artan, violating his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution.

A decision denying the appointment of second counsel under Penal Code section 987 is reviewed for abuse of discretion. "The abuse of discretion standard is used in many other contexts and reflects the trial court's superior ability to consider and weigh the myriad factors that are relevant to the decision at hand. A trial court will not be found to have abused its discretion unless it 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice.' " (*People v. Roldan, supra,* 35 Cal.4th at p. 688.) The right of a capital defendant to the resources necessary for a full defense must be carefully considered, and the demands of pretrial preparation in a complex case weigh in favor of appointing an additional attorney. (*Keenan v. Superior Court, supra,* 31 Cal.3d at pp. 430–432.) Nevertheless, it is the defendant's burden to make a specific showing of necessity. (*People v. Roldan, supra,* 35 Cal.4th at p. 687.) "The appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution. [Citations.]" (*People v. Clark* (1993) 5 Cal.4th 950, 997, fn. 22 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; accord, *People v. Williams* (2006) 40 Cal.4th 287, 300 [52 Cal.Rptr.3d 268, 148 P.3d 47].)

No abuse of discretion appears here. Citing *People v. Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149] (*Jackson*), disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, footnote 3 [103 Cal.Rptr.2d 23, 15 P.3d 243], defendant argues that Artan's inexperience was a compelling reason to appoint co-counsel. The defendant in *Jackson* relied on *Pierce v. United States* (D.C.App. 1979) 402 A.2d 1237, to support his claim that the court abused its discretion by summarily denying his

---

[6] This court has not yet decided whether *Harris* permits the appointment of private counsel when the public defender is available to represent the defendant. (See *People v. Cole* (2005) 33 Cal.4th 1158, 1186 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

request for second counsel. In *Pierce*, the trial court erred by not inquiring into the reasons for counsel's inability to handle the defense alone. The *Jackson* court distinguished *Pierce* because there counsel had admitted his lack of prior experience might necessitate additional legal assistance. (*Jackson, supra,* 28 Cal.3d at p. 287; see *Pierce v. United States, supra,* 402 A.2d at p. 1245.) No such admission was made in *Jackson,* and the trial court had extensive opportunity to evaluate counsel's ability before it ruled on the motion for additional counsel. (*Jackson, supra,* 28 Cal.3d at pp. 282, 287–288.)

*Jackson* was concerned with the scope of the trial court's inquiry into the need for additional counsel. In both *Jackson* and *Pierce,* the counsel seeking assistance was himself appointed by the court. (*Jackson, supra,* 28 Cal.3d at p. 282; *Pierce v. United States, supra,* 402 A.2d at pp. 1242–1243.) Thus, *Jackson* does not stand for the proposition that inexperience on the part of retained counsel justifies the appointment of co-counsel. In any event, it was not only Artan's inexperience that created difficulties in his pretrial preparation, but also the fact that he had four other cases set for trial before defendant's expected trial date. Under these circumstances, the court was justified in concluding it would be better to replace Artan, rather than appoint a second attorney.[7]

Defendant contends his case was especially complex, in both the guilt and penalty phases. He points out that Artan's requests for an investigator, a fingerprint expert, and a psychologist had been granted, and that the credibility of two accomplice witnesses required investigation. He notes a prosecutor's comment that it was "quite a complicated case." He observes that the evidence of aggravating and mitigating factors involved crimes committed in Maryland, and raised questions about his psychiatric condition. However, a review of the entire record fully supports the trial court's conclusion that this was not an especially complex case. The prosecutor who said the case "seems to be quite . . . complicated" was merely standing in for the prosecutor who was handling the case, at an early stage of the proceedings when Alexander and Rodriguez were still joined as defendants.

██ Defendant also asserts his request should have been granted because the appointment of second counsel would not have resulted in any unusual strain on public resources, given that Artan was representing him pro bono.[8]

---

[7] The *Pierce* court held that if, after a proper inquiry, the court decides existing counsel is unable to conduct an adequate defense, it may provide relief by appointing either co-counsel or substitute counsel. (*Pierce v. United States, supra,* 402 A.2d at p. 1245.)

[8] Defendant makes a cursory suggestion that equal protection principles entitle all indigent capital defendants to one attorney appointed at public expense, and that it was discriminatory for the trial court to deny him this benefit as an addition to Artan's services. This claim is not

The argument fails. Artan's pro bono status did not compensate for his lack of experience and his inability to prepare for trial because of conflicting obligations. The court was not required to ensure that defendant was represented by the counsel he preferred. It was required to take steps to provide him with an effective advocate, at public expense if necessary. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1184.) Artan's own representations to the court raised considerable doubt that he could be an effective advocate. It was well within the court's discretion to conclude that the appointment of second counsel was not an appropriate solution.

Defendant claims the court's decision amounted to a de facto removal of retained counsel. It was, however, Artan's decision to take other cases that prevented him from preparing adequately for defendant's trial, and it was Artan's own determination that it would be impossible for him to represent defendant without assistance. The trial court cannot be faulted for these circumstances.

### 2. Jury Selection

#### a. Batson/Wheeler *Claims*

During jury selection, defense counsel objected to the prosecutor's "apparent systematic exclusion of black female jurors." The objection was made under *People v. Wheeler* (1978) 22 Cal.3d 258 [188 Cal.Rptr. 425, 655 P.2d 1260] (*Wheeler*), but on appeal defendant also asserts error under the federal standard announced in *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*). An objection under *Wheeler* suffices to preserve a *Batson* claim on appeal. (*People v. Gray* (2005) 37 Cal.4th 168, 184, fn. 2 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Cornwell* (2005) 37 Cal.4th 50, 66, fn. 3 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

Defense counsel ultimately specified three African-American prospective jurors he suspected were peremptorily challenged for discriminatory reasons, though at first he mentioned only two, Prospective Jurors No. T3147 and No. C1752. Both, he argued, appeared to be bright, articulate women who had expressed equivocal views on both penalty and guilt issues, making them "exactly the type of jurors we're looking for." He asked the court to explore the prosecutor's reasons for excluding them. Presumably, counsel's grounds

---

sustainable. Defendant was seeking an extraordinary accommodation, not equal treatment. The demands of equal protection are satisfied by granting the trial court discretion to determine whether it is appropriate under the particular circumstances to appoint additional counsel at public expense. (*Jackson*, *supra*, 28 Cal.3d at pp. 286–287; see also *Keenan v. Superior Court*, *supra*, 31 Cal.3d at p. 429.)

for objection as to the third prospective juror, No. W3441, were the same, because he told the court he had no additional arguments when her exclusion was discussed.

The court noted that each of these prospective jurors had attitudes or family experiences making them "distinctive," and that four African-American women remained in the jury box. Accordingly, the court ruled that defendant had failed to make a prima facie case of discrimination.[9]

■ Both the California and United States Constitutions are violated by the exercise of peremptory challenges based on group bias, instead of reasons specific to the challenged prospective juror. (*People v. Cornwell, supra*, 37 Cal.4th at p. 66.) The procedure governing objections on this ground is settled: "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted (*Johnson*); see *People v. Cornwell, supra*, 37 Cal.4th at pp. 66–67.)

■ A defendant establishes a prima facie case of discrimination "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra*, 545 U.S. at p. 170.) An inference is a logical conclusion based on a set of facts. (*Id.* at p. 168, fn. 4.) When the trial court concludes that a defendant has failed to make a prima facie case, we review the voir dire of the challenged jurors to determine whether the totality of the relevant facts supports an inference of discrimination. (*Johnson, supra*, 545 U.S. at p. 168; *People v. Gray, supra*, 37 Cal.4th at p. 186.)

Here, the record supports the trial court's finding. Before reviewing the record of voir dire, we address two preliminary claims raised by defendant. First, he contends the court applied an erroneous standard to the prima facie determination. Defendant bases this argument on the following caution the

---

[9] At oral argument, defendant's appellate counsel asserted that six jurors, including another African-American woman and two African-American men, were improperly challenged by the prosecutor. Defendant forfeited any claim of error as to these additional jurors by failing to object at trial. The trial court had no occasion to consider whether they were dismissed for a discriminatory purpose. (*People v. Morrison* (2004) 34 Cal.4th 698, 709–710 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

trial court gave to defense counsel: "[I]t's got to be not simply that you don't see the reasons but that they are much like other jurors that have been left on the panel that are of different races, and so that the only conclusion that could be drawn or logical conclusion to draw is that they were excused because of their race and gender."

Defendant claims the "only logical conclusion" standard is more onerous than the "strong likelihood" standard in effect at the time of his trial in 1998. (See, e.g., *Wheeler, supra*, 22 Cal.3d at p. 280; *People v. Box* (2000) 23 Cal.4th 1153, 1188, & fn. 7 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Moreover, he notes that the "strong likelihood" standard itself, which we later explained meant only that "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias" (*People v. Johnson* (2003) 30 Cal.4th 1302, 1318 [1 Cal.Rptr.3d 1, 71 P.3d 270]), has been deemed "an inappropriate yardstick by which to measure the sufficiency of a prima facie case" by the United States Supreme Court. (*Johnson, supra*, 545 U.S. at p. 168.) As noted, a defendant need only make a showing sufficient to support an inference of discrimination. (*Id.* at p. 170.)

In this case the trial court apparently realized it had overstated the requirement, because it quickly restated the standard as "[a] logical conclusion to draw is that they were excused because of their race and gender." That alternate phrasing is fully consistent with *Johnson*. In any event, as in other post-*Johnson* cases, we are able to review the record to resolve the legal question whether defendant's showing supported an inference that the prosecutor excused a prospective juror for an improper reason. (*People v. Avila* (2006) 38 Cal.4th 491, 554 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1101 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Gray, supra*, 37 Cal.4th at p. 187; *People v. Cornwell, supra*, 37 Cal.4th at p. 73.)

Defendant also contends the trial court was required to seek reasons from the prosecutor for the peremptory challenges at issue, rather than offering its own explanations. He cites *Johnson* for the proposition that the trial judge should "have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated." (*Johnson, supra*, 545 U.S. at p. 170.) He also quotes *Johnson* as follows: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson, supra*, 545 U.S. at p. 172.)

Defendant's reliance on these passages is misplaced. The high court was discussing the considerations applicable at the third step of the *Batson* inquiry, *after* a prima facie case has been established. " 'It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.' " (*Johnson, supra,* 545 U.S. at p. 171, quoting *Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769], italics in *Purkett.*) As we explained in *People v. Cornwell,* "[o]nce the trial court concludes that the defendant has produced evidence raising an inference of discrimination, the court should not speculate as to the prosecutor's reasons—it should inquire of the prosecutor, as the high court directed. But there still is a first step to be taken by the defendant, namely producing evidence from which the trial court may infer 'that discrimination has occurred.' " (*People v. Cornwell, supra,* 37 Cal.4th at pp. 73–74, quoting *Johnson, supra,* 545 U.S. at p. 170.)

Here, defendant's showing was meager. This is not a case like *Johnson,* where a "suspicious" appearance was created by the prosecutor's removal of all prospective jurors in a cognizable group. (*Johnson, supra,* 545 U.S. at p. 173; *People v. Johnson, supra,* 30 Cal.4th at p. 1326.) Defendant concedes that three of the four African-American women who remained on the panel at the time of his *Wheeler* motion ultimately served on the jury.[10] However, he argues it was inappropriate for the trial court to rely on the presence of those four prospective jurors, because the prosecutor had not yet accepted them. To the contrary, the court properly noted that the percentage of African-American women challenged by the prosecutor had not reached a level that suggested an inference of discrimination, a point that was conceded by defense counsel below. (See *People v. Avila, supra,* 38 Cal.4th at p. 556; *People v. Gray, supra,* 37 Cal.4th at pp. 187–188; *People v. Cornwell, supra,* 37 Cal.4th at pp. 69–70.)

Counsel premised the *Wheeler* motion only on the ground that the challenged prospective jurors seemed to be intelligent and had expressed equivocal views on issues relevant to both the guilt and penalty phases. Certainly these qualities were attractive to defense counsel, but by themselves they hardly suggest the prosecutor was exercising her peremptory challenges based on race and gender. A tendency toward equivocation is seldom the first quality sought in a prospective juror by the party bearing the burden of proof. Moreover, the views or family experiences disclosed by these women were more than sufficient to overcome any inference of improper discrimination.

---

[10] Defendant also acknowledges that the seated jury was quite diverse, consisting of the three African-American women, three Caucasian men, three Caucasian women, two Hispanic men, and one Hispanic woman. The four alternates were a Hispanic man and woman, and a Caucasian man and woman.

Prospective Juror No. T3147's brother was convicted of robbery in 1996. She believed the police did not do a thorough investigation. She maintained that police officers had "coached" a witness to identify him. The court noted this was a "very distinctive feature" showing "clear bias." Defendant observes that this prospective juror said she would not hold her brother's experience against any officer who might testify, that a cousin of hers was a Los Angeles police officer, and that other relatives had been crime victims. Defendant also points out that she personally had had a positive experience with a police officer. Nevertheless, under these circumstances, no inference of discrimination arises from the removal of a prospective juror whose brother had a recent negative experience with the criminal justice system.

Prospective Juror No. W3441's husband was convicted of robbery in 1994. She felt the public defender had not presented the proper evidence. She said she was strongly opposed to the death penalty, and thought it was imposed too often. While she said she would not always vote against the death penalty for a defendant found guilty of intentional first degree murder with a special circumstance, she also answered "no" when asked if she could impose the death penalty in a case involving the charges against defendant. She said she could see herself rejecting the death penalty in favor of life imprisonment without the possibility of parole, but could not see herself choosing the death penalty instead of life imprisonment without the possibility of parole.

The trial court referred primarily to this prospective juror's attitude toward capital punishment, but also mentioned her husband's conviction and experience with the public defender. Defendant notes that Prospective Juror No. W3441 equivocated when questioned by the court, saying it would be possible for her to change her mind about the death penalty, depending on the circumstances. She also said her concern about her husband's legal representation would not affect her consideration of this case. Defendant points out that this prospective juror had relatives working in law enforcement, and had previous jury experience. However, under all the relevant facts, including the prospective juror's strongly stated antipathy to the death penalty and her husband's conviction four years earlier, no inference of discrimination can be drawn from the record.

Prospective Juror No. C1752's nephew was serving a life sentence without the possibility of parole for a murder committed in Los Angeles County. Another nephew and a stepson had been imprisoned for drug offenses. The trial court questioned her about the nephew in prison for murder. The prospective juror had mistakenly identified him as a murder victim on her

questionnaire.[11] She knew about his case only from speaking with relatives. She understood that her nephew was found with the victim's credit card, and that other people were involved in the crime. She knew nothing about the prosecution and said it would not affect her judgment. Addressing defendant's *Wheeler* claim, the court said that the nephew's conviction for a robbery murder in the county made Prospective Juror No. C1752 "distinctive from the rest of the group."[12] Again, on this record no inference of group bias appears from the prosecutor's decision to challenge a prospective juror whose family members were serving or had served prison terms.

Defendant fell far short of "showing that the totality of the relevant facts [gave] rise to an inference of discriminatory purpose." (*Batson*, *supra*, 476 U.S. at p. 94; see also *Johnson*, *supra*, 545 U.S. at p. 168; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 66.) The trial court correctly determined that he failed to make a prima facie showing of a *Batson/Wheeler* violation.

b. *Challenges for Cause*

■ Defendant contends the court erroneously excused two prospective jurors for cause because of their concerns about the death penalty. Under the applicable state and federal constitutional provisions, prospective jurors may be excused for cause if their views would prevent or substantially impair the performance of their duties. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Griffin* (2004) 33 Cal.4th 536, 558 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

" 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding

---

[11] Prospective Juror No. C1752 made other mistakes on her questionnaire in response to questions about the penalty for murder. The court clarified her answers during voir dire.

[12] In his reply brief, defendant disputes the trial court's observation that the nephew's conviction made this prospective juror "distinctive." He claims that a seated juror also had a close relative who was convicted of a crime, and another juror who served had a nephew who was accused of robbery. Defendant does not, however, identify these jurors or provide record cites to support his claims. Nor are either of the circumstances alleged by defendant analogous to the situation of a prospective juror for a murder trial with a relative who was convicted of murder in the same county.

This court has refrained from deciding whether comparative juror analysis is appropriate for the first time on appeal. (See *People v. Williams*, *supra*, 40 Cal.4th at p. 312; *People v. Avila*, *supra*, 38 Cal.4th at p. 546.) Defendant's belatedly and insufficiently briefed claim does not require us to consider that question here.

whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]' " (*People v. Boyette* (2002) 29 Cal.4th 381, 416 [127 Cal.Rptr.2d 544, 58 P.3d 391]; accord, *People v. Moon* (2005) 37 Cal.4th 1, 14 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

Substantial evidence supports the trial court's findings in this case. Both the prospective jurors in question gave equivocal and conflicting responses to questions about capital punishment.

Prospective Juror No. G3442 stated on his questionnaire that he was "strongly against" the death penalty. Asked for his general feelings on the subject, he wrote, "I think it is wrong." He said he would always vote against the death penalty at one point, but later wavered, writing on two occasions that "I never say never, but probably not." He noted that he might agree to the death penalty if a friend of his were killed.

When questioned by the court, Prospective Juror No. G3442 said he was "not a big fan" of the death penalty. He first told the court he thought he could impose the death penalty as a "realistic, practical possibility," but then said he was not sure and "wouldn't want to say I definitively could," concluding that it was "probably not possible." However, under questioning by defense counsel he conceded he would have to follow the law even if he did not like it. When asked if he could follow the court's instructions on the death penalty, he said, "I believe so." Pressed for an unequivocal answer, he said he would be able to follow the law, adding that he was "unequivocal about that." Counsel then asked if he would be able to impose the death penalty. He replied, "yes, I think I might be." Counsel sought a firmer answer, saying, "when you say yes, you think," and the juror responded, "yes, yes." Prospective Juror No. G3442 confirmed his strong opposition to the death penalty when questioned by the prosecutor, but said it was "possible" he could vote for death, adding, "realistic and practical standard, don't know if I could hold myself up to that, but it's possible." The prosecutor asked about his questionnaire response that he would always vote against the death penalty. He replied, "perhaps I've changed my mind since then."

Prospective Juror No. M6949 stated on his questionnaire that he was "moderately against" the death penalty, and would prefer life in prison without the possibility of parole. He was "not sure" if he would always vote against the death penalty, either in general or in light of the charges against defendant. He said he could see himself rejecting the death penalty and choosing a life term, but could not see himself rejecting a life term in favor of the death penalty. However, he also indicated that the determination "depends on the circumstances."

Prospective Juror No. M6949 told the court he had "mixed emotions" about capital punishment. Asked to explain, he said he did not know how he would react when the time came to make a decision. The court asked if imposing death would be "a realistic, practical possibility or only a very remote possibility that isn't very real." The prospective juror replied "it's a remote possibility." He told defense counsel he did not believe in the death penalty as a general principle, explaining this was "just a personal feeling." Asked about his statement that it "depends on the circumstances," he said, "since then, I've been thinking about it," and "I just have difficulty with it. That's all." Asked if he could follow the instructions and impose the death penalty based on the evidence, he said, "I guess I could do it."

Defendant contends the responses of these prospective jurors showed only that they might have a higher than average threshold for imposing the death penalty, not that their ability to properly deliberate would be substantially impaired. He argues that reversal of the penalty judgment is required under *People v. Stewart* (2004) 33 Cal.4th 425, 446–447 [15 Cal.Rptr.3d 656, 93 P.3d 271], and *People v. Heard* (2003) 31 Cal.4th 946, 964–966 [4 Cal.Rptr.3d 131, 75 P.3d 53]. However, unlike the prospective jurors in those cases, Prospective Jurors No. G3442 and No. M6949 gave answers during voir dire indicating there was only a slim possibility they could vote for the death penalty, regardless of the state of the evidence. While they also made more equivocal statements, we will not interfere with the trial court's resolution of the conflicts. "[W]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when 'the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.' " (*People v. Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; accord, *People v. Harris* (2005) 37 Cal.4th 310, 331 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Griffin, supra,* 33 Cal.4th at p. 559.)

### B. *Guilt Phase Issues*

#### 1. *Alexander's Testimony About Defendant's Violent Past*

Defense counsel cross-examined Shawn Alexander briefly about the terms of his plea agreement, and at length about his knowledge of defendant's intentions and his willingness to participate in the course of events. Alexander admitted that when he saw defendant emerge from Taylor's house with a gun, he knew something other than loading stereo equipment into the car was involved. Alexander said he had considered leaving but was "too afraid," "because he had a gun, and I didn't want to take no chances."

Alexander also acknowledged that he knew "something ugly was going to take place" when he saw defendant take a rope, tape, and a bottle of chemicals from the trunk of the car. He conceded he had done nothing to stop what was about to happen. Counsel suggested that he did not intervene because he had expected to be paid, which Alexander denied. Alexander agreed, however, that he could have walked away from the scene of the murder.

On redirect examination, the prosecutor established that Alexander had not walked away from the scene because he was afraid of defendant. Alexander referred again to the gun, and said he didn't want to "take no chance on leaving." The prosecutor asked if defendant had said anything to make Alexander believe defendant would use the gun on him. Alexander said defendant had threatened to kill him if he said anything about the murder. The prosecutor asked if Alexander regretted not walking away. Alexander said no; he explained at first that he had felt his life was in danger, but then said that was not really the case, and that he simply "didn't want to take any chances on leaving because of Mr. Lancaster."

On recross-examination, defense counsel established that defendant did not threaten to kill Alexander until after the shooting, and pressed him about why he had not left the scene earlier. Alexander repeated that he was afraid because defendant had the gun. The prosecutor in turn asked Alexander if defendant had seemed angry or upset on the way to the scene. Alexander said no. The prosecutor inquired whether Alexander "had any knowledge at that time that the defendant had been violent in his past?" Alexander said yes, defendant had told him that "when he was 14, he had just got out of jail from murdering a cop." Asked if that had been a factor in his fear of defendant at the crime scene, Alexander said no, he did not have that in mind. He was fearful because defendant had a gun.

Defense counsel did not object to this line of questioning. Rather, he challenged whether Alexander really believed defendant had shot a policeman. Counsel asked Alexander if he thought someone who did that would be released from jail. Alexander said no. Counsel observed that defendant must have been lying, but Alexander explained that defendant had been a juvenile at the time, and may have been released on that basis.

Defendant contends the prosecutor committed misconduct by eliciting the "inflammatory" testimony regarding defendant's murder of a police officer. He also claims his attorney's failure to object amounted to ineffective assistance of counsel, and the trial court's failure to intervene on its own motion violated his right to a fair trial. These arguments are meritless. Defendant's failure to object forfeited any claim of prosecutorial misconduct

or error by the trial court. (*People v. Cornwell, supra,* 37 Cal.4th at p. 96; *People v. Young* (2005) 34 Cal.4th 1149, 1187 [24 Cal.Rptr.3d 112, 105 P.3d 487].) Nor can defense counsel be faulted for failing to object, a tactical decision that rarely establishes ineffective assistance. (*People v. Chatman* (2005) 38 Cal.4th 344, 384 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

Certainly it was a reasonable tactic for counsel to attack Alexander's credibility by showing he was a willing participant in the crime, and to discredit his claims that he was afraid of defendant. The prosecutor was entitled to try to rehabilitate her witness by establishing the grounds for his professed fear. (*People v. Cleveland* (2004) 32 Cal.4th 704, 745–746 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Thus, any objection by defense counsel was quite likely to have been overruled. Instead, counsel made another reasonable tactical decision to use Alexander's answer to further challenge his believability. The notion that a juvenile would be released at age 14 after killing a police officer is certainly questionable. By making this point, counsel not only attacked Alexander's credibility, but also cast doubt on the accuracy of the claim itself. Defendant falls far short of overcoming the strong presumption that counsel's strategy fell within "the wide range of reasonable professional assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

### 2. *Marston's Testimony About the Threat to Taylor*

As Robert Marston began his testimony, defense counsel asked for a sidebar conference. He anticipated that Marston would relate defendant's statement to Taylor that things would "get rough" if Shambulia's group did not get the radio equipment. Counsel argued that this testimony was double hearsay. The prosecutor contended the threat was relevant to show Taylor's state of mind when he left his home with defendant. Defense counsel responded that the threat was actually directed at Marston, so its tendency to prove Taylor's state of mind was speculative. The court noted that Taylor and Marston were working together to set up the radio station, and overruled the objection. Marston testified that when he spoke with Taylor the day before the murder, Taylor reported that defendant had "told me to tell you that if he—if they don't get this equipment, things are going to get rough."

This testimony was clearly relevant to establish that Taylor was taken against his will, an element of the kidnapping offense. (*People v. Hill* (2000) 23 Cal.4th 853, 856 [98 Cal.Rptr.2d 254, 3 P.3d 898]; *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 864 [117 Cal.Rptr.2d 504].) However, defendant claims it was inadmissible under *People v. Lew* (1968) 68 Cal.2d 774 [69 Cal.Rptr. 102, 441 P.2d 942]. The *Lew* court held that testimony about the defendant's threats was relevant to explain the murder victim's conduct, but

was nevertheless improperly admitted, partly because it was not sufficiently " 'trustworthy and credible.' " (*Id.* at p. 780; see also Evid. Code, § 1252.) Defendant argues that the threat here was vague, Marston was a witness interested in the conviction of his friend's killer, and there was no corroboration that the phone call between defendant and Taylor had occurred or that Marston had accurately related the threat. These claims are manifestly inadequate. Counsel did not raise the question of corroboration below, no doubt because he knew Tyrone Floyd would testify that Taylor also told him about the threat. Floyd's testimony was more than sufficient to establish the trustworthiness of Marston's version of the event.

In his reply brief, defendant expands his argument to include Floyd's testimony as well, contending the adverse ruling on his objection to Marston's testimony justified counsel's failure to object when Floyd mentioned the threat made by defendant. Defendant asserts that because Taylor himself was not threatened, the threat was irrelevant to the forcible asportation element of kidnapping. These contentions are as meritless as they are belated. Floyd did not testify that the threat was meant for Marston, and his account of Taylor's behavior the next day clearly established Taylor's fearful reaction.[13] In any event, as the trial court pointed out and as defendant concedes, Marston and Taylor were working closely together. Defendant's statement was reasonably understood as an attempt to intimidate both of them.

Defendant contends the testimony was unduly prejudicial. Trial courts have broad discretion to weigh the prejudicial impact of testimony against its probative value. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Defendant fails to show any abuse of discretion. The testimony about the threat was highly relevant to show the deteriorating relationship between Taylor's and Shambulia's groups, and to refute the theory that Taylor may have voluntarily accompanied defendant the night he was killed.

Finally, defendant argues that his hearsay objection put Taylor's trustworthiness in question. Defendant speculates at length about the relations between Taylor, Marston, and Floyd to suggest that Taylor had a motive to convey the threat in slightly different terms to these two witnesses. This claim is unsustainable. Two witnesses described essentially the same threat in the same timeframe. The testimony was relevant to explain Taylor's conduct and was properly admitted.

---

[13] Floyd said Taylor told him that "he received a phone call from Hodari [i.e., defendant] and that Hodari stated that if he didn't get the microwave transmitter back, that it would get nasty." Floyd described Taylor as "very nervous" when he relayed the threat, and also the next day when they attended a party together.

### 3. *Asserted* Griffin *Error*

During closing argument, the prosecutor reminded the jury about the Liquid-Plumr bottle found at the scene, and observed: "It was new, it still had liquid in it, and had the defendant's prints all over it. There's been no explanation offered as to how they possibly could have been there." Defendant claims this was an improper comment on his failure to testify under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

Defendant failed to object or seek an admonition below; thus this claim of error was not preserved. (*People v. Turner* (2004) 34 Cal.4th 406, 420 [20 Cal.Rptr.3d 182, 99 P.3d 505].)[14] In any event, the prosecutor's statement was a fair comment on the state of the evidence, rather than a comment on defendant's failure to personally provide an alternative explanation. (*Turner*, at p. 419; see also *People v. Carter* (2005) 36 Cal.4th 1215, 1266 [32 Cal.Rptr.3d 838, 117 P.3d 544], citing cases; *People v. Hughes* (2002) 27 Cal.4th 287, 372–374 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

### 4. *The CALJIC No. 2.11.5 Instruction*

At the prosecutor's request, the court gave the jury a modified version of CALJIC No. 2.11.5, as follows: "There has been evidence in this case indicating that a person other than the defendant, Shawn Alexander and Jornay Rodriguez, was or may have been involved in the crime for which the defendant is on trial. There may be many reasons why that person is not here on trial. Therefore do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he or she has been or will be prosecuted. Your duty is to decide whether the People have proved the guilt of the defendant on trial."

Defendant acknowledges this instruction was intended to apply to Mzee Shambulia, and claims no error in that regard. He asserts, however, that the jurors may have improperly inferred that they should not consider or discuss why Alexander and Rodriguez were not being prosecuted. Defendant contends the instruction should have affirmatively informed the jurors that they

---

[14] Defendant suggests there was no waiver because an objection would merely have drawn further attention to his failure to testify. No authority supports this notion. Defendant cites *People v. Murtishaw* (1981) 29 Cal.3d 733, 758–759 [175 Cal.Rptr. 738, 631 P.2d 446], disapproved on another ground in *People v. Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782]. In *Murtishaw*, however, we held that counsel's failure to object to the first instance of claimed *Griffin* error barred the defendant from raising the issue on appeal. We noted that objection to repeated improper references might be excused, but that there was no reason to believe an initial curative instruction would not have put an end to the prosecutor's comments. Here, defendant does not complain about repeated references.

were obligated to consider the fact that Alexander and Rodriguez were not being tried along with him, and to "consider the implications of prosecutorial leniency."

Defendant sought no such modification below. Even if the assignment of error was not waived (see *People v. Sully* (1991) 53 Cal.3d 1195, 1218 [283 Cal.Rptr. 144, 812 P.2d 163]), his argument fails on the merits. Alexander and Rodriguez were specifically and properly excepted from the scope of the instruction. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 226–227 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Moreover, the jury was instructed on witness credibility and accomplice testimony, which properly informed its consideration of their testimony. (*People v. Cornwell, supra,* 37 Cal.4th at p. 88.) Defendant cites no authority for the proposition that the trial court should have, on its own motion, directed the jury to deliberate about the implications of Alexander's and Rodriguez's guilty pleas.

### 5. *Failure to Instruct on Second Degree Murder*

Over defense counsel's objection, the trial court declined to instruct the jury on second degree murder. The court found no evidence to support the theory that Taylor left his home voluntarily, so it concluded his killing was necessarily a first degree murder committed during a kidnapping (Pen. Code, § 189).

Defendant contends there was substantial evidence from which the jury could have found that Taylor had agreed to go with defendant to discuss the transmitter dispute, and defendant only later decided to kill him on a sudden impulse. This is a tenuous argument, but we need not resolve it on the merits. It is well established that "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392]; accord, *People v. Horning* (2004) 34 Cal.4th 871, 906 [22 Cal.Rptr.3d 305, 102 P.3d 228]; see also, e.g., *People v. Earp* (1999) 20 Cal.4th 826, 885–886 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

Here, the jury returned a true finding on the kidnapping-murder special circumstance (Pen. Code, § 190.2, subd. (a)(17)(B)), and therefore necessarily rejected the factual theory on which defendant's argument for a second degree murder instruction rests. Defendant argues that the jury's finding was not conclusive on this point, because it was reached in the absence of alternative possible verdicts. However, as in *People v. Horning,* "[i]f the jury had had any doubt that this was a felony murder, it did not have to acquit but

could have simply convicted defendant of first degree murder without special circumstances." (*People v. Horning, supra,* 34 Cal.4th at p. 906.)

### 6. *Amendment of the Information*

Count one of the information originally charged defendant with murder during "the commission of the crime of Kidnapping, and/or Kidnapping for Ransom, within the meaning of Penal Code section 190.2(a)(17)." Count one also included the special circumstance allegation that the murder was done for financial gain. (Pen. Code, § 190.2, subd. (a)(1).) Count two charged defendant with "the crime of KIDNAPPING FOR RANSOM, in violation of PENAL CODE SECTION 209(a)," and alleged that he and his accomplices seized and detained Taylor "for ransom, reward, extortion, and to exact from relatives and friends of said MICHAEL TAYLOR money."

During a discussion on jury instructions, the trial court raised the issue of whether the kidnapping could be said to have been for the purpose of ransom. The prosecutor suggested instructing the jury in terms of intent "to extract from another any money or a valuable thing." Defense counsel argued that defendant had only sought information from Taylor. The court agreed with the prosecutor that information could be a "valuable thing," but remained troubled by the term "ransom."

When the court said it intended to instruct the jury on simple kidnapping, kidnapping for extortion, and the definition of extortion, defense counsel objected that the court was "adding another special circumstance for financial gain. I think that should have been pled . . . ." The court responded that the special circumstance of murder for financial gain was alleged in the information. Defense counsel then argued that kidnapping for extortion did not include a situation where the victim was the subject of the extortion. However, counsel did not press this point after the prosecutor said she had case authority to the contrary. (See *People v. Kozlowski, supra,* 96 Cal.App.4th 853, 871.)

The court then noted that the prosecutor had asked for instruction on bodily harm or death in connection with the kidnapping count, but the information did not allege the infliction of bodily harm or death. The prosecutor moved to amend the information to include that allegation. Defense counsel objected, claiming the request was untimely. The court and the prosecutor mentioned that an amendment to allege personal use of a firearm was also anticipated. At this point, defense counsel renewed his argument on the extortion element of kidnapping, arguing that a demand for the address where the transmitter could be found did not amount to extortion. The court told counsel he was free to make that argument to the jury.

Addressing the amendments both as to firearm use and bodily harm or death, counsel complained that the prosecution had long known the underlying facts. He contended it was unfair to add these allegations at such a late date, depriving the defendant of the opportunity to defend against them. The court observed that the victim's death in the course of a kidnapping was already alleged as part of count one, and overruled the objection.

After the prosecution rested, defense counsel moved for a judgment of acquittal on count two "for the reasons heretofore articulated, unless your Honor wants me to go through them again." The court framed the issue as follows: The information referred to kidnapping for ransom in count one, and count two designated the offense as kidnapping for ransom, but the evidence supported only the crime of kidnapping for the purpose of extortion. However, count two also specifically alleged extortion as a purpose of the kidnapping. For that reason, the court denied the motion for acquittal, though it acknowledged the evidence did not support kidnapping for ransom. Following this ruling, the defense rested its case.

The information was amended to omit any mention of ransom in count one, referring simply to murder committed during "the commission of the crime of kidnapping, within the meaning of Penal Code section 190.2(a)(17)." Count two, however, still designated the kidnapping charge as "KIDNAPPING FOR RANSOM," though the prosecutor added "and other valuable things" to the "money" defendant was charged with intending to extort and extract from Taylor's relatives and friends.

Defendant claims he was prejudiced by these amendments. He argues that his counsel had determined not to present a defense to the charge of kidnapping for ransom because it lacked any factual basis. He contends he was deprived of the opportunity to prepare a defense to the different charge of kidnapping for extortion. However, as the court noted in ruling on the motion for acquittal, extortion was originally pleaded in count two. It is clear that count two, in both the original and amended informations, referred to kidnapping for ransom as a shorthand way of designating the aggravated kidnapping offenses enumerated in Penal Code section 209, as opposed to "simple kidnapping" under Penal Code section 207. Defense counsel's objection below was not to the addition of an extortion element, which in fact was not accomplished by the amendments to the information. Rather, he took the position that the events shown by the evidence did not amount to extortion. His timeliness objection was directed at the addition of special circumstance allegations for firearm use and the infliction of bodily harm and death, not at the extortion aspect of the kidnapping charge.

Thus, the record fails to support defendant's argument that counsel's strategy for defending against the kidnapping charge was unfairly disrupted by the amendment of the information.

### 7. Failure to Instruct on a Claim-of-right Defense

As noted above, during a discussion of the kidnapping instructions defense counsel maintained that defendant's attempt to discover where the transmitter was located did not amount to extortion. Counsel said at one point, "I don't think that's what kidnapping for ransom or extortion is. They were asking for something that he was probably entitled to, and I just don't see where that falls under that."

 Defendant claims the trial court should have instructed on claim of right as a defense to kidnapping for extortion. Yet defendant did not seek such an instruction, and any such request would have been improper. The claim-of-right defense does not extend to the crime of extortion. (*People v. Beggs* (1918) 178 Cal. 79, 84 [172 P. 152]; accord, *People v. Tufunga* (1999) 21 Cal.4th 935, 955–956 [90 Cal.Rptr.2d 143, 987 P.2d 168].) Therefore, it cannot be raised as a defense to a charge of kidnapping for ransom or extortion. (*People v. Serrano* (1992) 11 Cal.App.4th 1672, 1677–1678 [15 Cal.Rptr.2d 305].)

Defendant argues that because he was attempting to recover specific personal property, his case comes within the rationale of *Tufunga*, where we limited the claim-of-right defense in the robbery context to forcible takings intended to recover personal property. (*People v. Tufunga, supra*, 21 Cal.4th at p. 956.) In *Tufunga*, however, we approved the holding in *Beggs* that the wrongful means employed in *extortion* cannot be justified by a claim of right. (*People v. Tufunga, supra*, 21 Cal.4th at pp. 955–956.) We upheld the claim-of-right defense to *robbery* based on our conclusion that the Legislature had codified the common law recognition of the defense in robbery prosecutions where the defendant sought to recover specific personal property. (*Id.* at p. 950.) Thus, *Tufunga* does not help defendant. He refers us to nothing suggesting a similar codification of the common law claim-of-right defense for either extortion or kidnapping.

### 8. Modification of CALJIC No. 8.80.1

The trial court gave the jury the following version of CALJIC No. 8.80.1:

"If you find the defendant in this case guilty of murder of the first degree, you must then determine whether either or both of the following special circumstances are true or not true:

"One, murder during the perpetration of kidnapping;

"And, two, intentional murder for financial gain.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"Unless an intent to kill is an element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.

"You must decide separately each of the special circumstances alleged in this case. If you cannot agree on both of the special circumstances but can agree as to one, you must make your finding as to the one upon which you do agree.

"In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously. You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied."

The trial court omitted the following paragraphs from the standard instruction:

"[If you find that a defendant was not the actual killer of a human being, [or if you are unable to decide whether the defendant was the actual killer or [an aider or abettor] [or] [co-conspirator],] you cannot find the special circumstance to be true [as to that defendant] unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] any actor in the commission of the murder in the first degree] [.] [, or with reckless indifference to human life and as a major participant, [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] in the commission of the crime of ____ [(Penal Code, § 190.2(a)(17) crime)]____ which resulted in the death of a human being, namely _____.]

"A defendant acts with reckless indifference to human life when that defendant knows or is aware that [his] [her] acts involve a grave risk of death to an innocent human being."

▮ Defendant claims the omission violated the requirements imposed by *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368],

and *Tison v. Arizona* (1986) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676]. The *Enmund* court held that the Eighth Amendment does not permit imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund v. Florida, supra*, 458 U.S. at p. 797.) The *Tison* court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison v. Arizona, supra*, 481 U.S. at p. 158.)

Instruction on these factors is required only when the evidence would support a finding that the defendant was an accomplice rather than the actual killer. If the evidence and the theory on which the case was tried leave no doubt that the jury found the defendant to be the actual killer, there is no constitutional violation. (*People v. Young, supra*, 34 Cal.4th at p. 1204.) Defendant argues that because his counsel attempted to shift responsibility for the actual killing from defendant to Rodriguez, the other armed participant in the kidnapping, the issue of defendant's vicarious liability for felony murder was before the jury. The argument lacks merit.

There was no evidence that anyone but defendant shot Taylor. Defense counsel's suggestions to the contrary were simply speculation, and certainly were not intended to establish defendant's vicarious liability for felony murder. The prosecutor mentioned in passing that for purposes of felony murder "it doesn't matter which of the participants actually pulled the trigger," but she consistently argued that defendant was the actual killer. She relied on the felony murder rule only for the purpose of establishing the intent required for a first degree murder verdict, not to argue that defendant could be held vicariously liable. The court did not instruct on the liability of an aider and abetter for felony murder. (See CALJIC No. 8.27.) It instructed that "the unlawful killing of a human being whether intentional, unintentional or accidental which occurs during the commission or attempted commission of the crime of kidnapping is murder of the first degree when the perpetrator had the specific intent to commit kidnapping." (CALJIC No. 8.21.) The verdict form reflects a finding that "the murder of MICHAEL TAYLOR was committed by defendant, ANDREW LANCASTER, while the defendant was engaged in the commission of the crime of kidnapping."

The evidence, argument, jury instructions, and verdict all reflected that defendant's guilt depended on his role as the actual killer. The trial court's modification of CALJIC No. 8.80.1 was proper.

C. *Penalty Phase Issues*

1. *Defendant's Possession of Handcuff Keys*

a. *Background*

In determining whether to impose the death penalty, the jury may consider as an aggravating factor "criminal activity by the defendant which involved the use or attempted use of force or violence or . . . the express or implied threat to use force or violence." (Pen. Code, § 190.3, factor (b).) At the beginning of the penalty phase here, the prosecutor informed the court and defense counsel that she intended to file an amended notice of evidence in aggravation, including a report that defendant had been found in possession of a handcuff key in jail. Defense counsel objected that possession of a handcuff key did not "pertain to violence." The item was not an actual handcuff key, but a manufactured implement that "they construe to be able to be a handcuff key."

The court suggested the evidence might relate to an attempted escape. Defense counsel responded that mere possession of something that might be used as a handcuff key did not amount to attempted escape. The court asked counsel to research whether the handcuff key evidence was admissible. Subsequently, the court decided the handcuff key evidence was admissible under Penal Code section 190.3, factor (b), based on a statement in *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279] (*Howard*). The court recognized that the *Howard* court had refrained from deciding the admissibility issue, due to the overwhelming evidence of other criminal activity committed by the defendant. However, it quoted the following passage: "Arguably, under the circumstances, the possession of the handcuff key and its implied intended use to permit defendant to free himself from handcuffs, normally worn during defendant's transportation in the custody and presence of law enforcement personnel, constituted criminal activity which posed an 'implied threat' to use force or violence." (*Howard, supra,* 44 Cal.3d at p. 428.) The prosecutor adopted this rationale for presenting the handcuff key evidence. Defense counsel argued that defendant had made no attempt to escape, nor was there any record that he had ever removed his handcuffs. The court noted, as recognized in *Howard,* that not all escapes are violent offenses. (*Id.* at pp. 427–428.) Nevertheless, it concluded that the circumstances under which jail inmates are handcuffed are such that any resulting escape would be forceful or violent.

A sheriff's deputy testified that he had seen handcuff keys "several times." He described them as small, slim pieces of metal, usually box staples. Inmates straightened them, sharpened one end, and formed a hook at the

other. Inmates had used such keys to escape from their handcuffs "several times." The deputy had found three such keys in defendant's cell, but did not remember where in the cell they were. His written report did not include the location of the keys, which had been "disposed of." The deputy did not have with him the records showing how long it had been since another inmate occupied the cell. However, the cell would have been thoroughly searched before defendant was housed in it.

During a discussion of jury instructions, the court indicated it was contemplating an instruction on escape, explaining: "What I'm trying to do is relate a criminal offense to the possession of the handcuff keys so that that can be an implied threat to use force or violence." The court noted that mere possession of a handcuff key in jail is not a crime. Defense counsel renewed his objection that there was an insufficient connection between possession of the keys and any escape or violence. He conceded that the court had already ruled on the point when it admitted the handcuff key evidence, but said he would prefer to leave the subject out of the instructions. The court, however, proposed instructing the jury on escape by force or violence, in order to connect the possession of handcuff keys with a crime involving a threat of force or violence. It noted that the instruction was not required, if counsel did not want it. He decided not to request the instruction, on the theory that "the less that's said about it the better."

The court instructed that the jury could consider the following criminal acts allegedly committed by defendant as aggravating circumstances: "Rape, robbery, possession of a weapon in jail and possession of a handcuff key in jail which involved the . . . express or implied use of force or violence or the threat of force or violence." The jury was told it must find that defendant committed these criminal acts beyond a reasonable doubt. The court gave instructions on the elements of rape, robbery, and possession of a dirk, dagger, or sharp instrument in jail. It gave no instruction on escape or possession of handcuff keys.

### b. *The Court's Error*

Defendant raises several arguments regarding the handcuff keys, including that the evidence was insufficient to establish a threat of violence. He observes that in *Howard*, we quoted *People v. Lopez* (1971) 6 Cal.3d 45, 52 [98 Cal.Rptr. 44, 489 P.2d 1372], for the proposition that " '[t]he possibility of violence during an escape can become an actuality only when, under the facts of the particular case, the escapee attempts violent resistance or, in his efforts to elude capture, conducts himself in a reckless manner.' " (*Howard, supra*, 44 Cal.3d at pp. 427–428.) Defendant contends that mere possession of handcuff keys does not rise even to the level of an attempted escape, and

thus cannot be said to involve any "express or implied threat to use force or violence" under Penal Code section 190.3, factor (b). We review the trial court's ruling for abuse of discretion. (*People v. Griffin, supra,* 33 Cal.4th 536, 587.) Defendant's claim is correct.

The criminal activity contemplated by Penal Code section 190.3 is conduct that constitutes an offense proscribed by statute. " 'Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows "conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute . . . ." ' (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1259 [278 Cal.Rptr. 640, 805 P.2d 899]; *People v. Anderson* (2001) 25 Cal.4th 543, 588 [106 Cal.Rptr.2d 575, 22 P.3d 347] [§ 190.3, factor (b) requires that conduct be 'criminal in fact' in order to constitute valid penalty evidence].)" (*People v. Hughes, supra,* 27 Cal.4th 287, 382; see also, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 859 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Clair* (1992) 2 Cal.4th 629, 672 [7 Cal.Rptr.2d 564, 828 P.2d 705].) As the trial court also recognized, possession of makeshift handcuff keys is not such an offense.

The Attorney General argues that attempted escape is criminal activity for purposes of Penal Code section 190.3, and the only reason for defendant to have had the handcuff keys would have been to use them to escape. This argument finds some support from the dicta in *Howard,* but ultimately is not sustainable. In *Howard,* we acknowledged that escape is not an inherently dangerous crime, quoting *People v. Lopez, supra,* 6 Cal.3d 45, a felony murder case.[15] (*Howard, supra,* 44 Cal.3d at pp. 427–428.) Nevertheless, we observed that "[a]rguably, under the circumstances" the defendant's "possession of the handcuff key and its implied intended use" to facilitate an escape from the immediate custody of law enforcement officers would amount to criminal activity posing an implied threat of force or violence. (*Id.* at p. 428.) We did not reach the question of admissibility, however, nor did we examine the circumstances of the defendant's handcuff key possession in any detail.[16]

---

[15] In *People v. Mason* (1991) 52 Cal.3d 909 [277 Cal.Rptr. 166, 802 P.2d 950], we made it clear that whether escape is a dangerous crime for purposes of the felony murder rule has no bearing on whether a particular escape or escape attempt involves an "express or implied threat to use force or violence" for purposes of Penal Code section 190.3, factor (b). That is a question that "can only be determined by looking to the facts of the particular case." (*Mason, supra,* 52 Cal.3d at p. 955.)

[16] Similarly, in *People v. Ochoa* (2001) 26 Cal.4th 398 [110 Cal.Rptr.2d 324, 28 P.3d 78], disapproved on another point in *People v. Prieto* (2003) 30 Cal.4th 226, 263, footnote 14 [133 Cal.Rptr.2d 18, 66 P.3d 1123], we noted that possession of a handcuff key might "evince an express or implied threat to use force or violence," under the reasoning of *Howard.* (*Ochoa, supra,* 26 Cal.4th at p. 447.) However, as in *Howard,* we refrained from resolving the question, noting that there was also "abundant additional evidence of violent activity" by Ochoa. (*Ochoa, supra,* 26 Cal.4th at p. 448.)

▇▇▇ For evidence of handcuff key possession to be admissible in connection with an attempted escape, the prosecution must show that the defendant made such an attempt. In *People v. Kipp* (2001) 26 Cal.4th 1100 [113 Cal.Rptr.2d 27, 33 P.3d 450], for instance, the defendant's threat to kill a sheriff's deputy was not "criminal activity" under Penal Code section 190.3, having occurred before the statute criminalizing such threats took effect. However, we held it was properly admitted as evidence of the defendant's attempt to escape. (*Kipp, supra,* 26 Cal.4th at p. 1133.) Here, defendant's possession of handcuff keys was not sufficient to establish an escape attempt. Attempted escape requires a "direct, unequivocal act to effect that purpose." (*People v. Gallegos* (1974) 39 Cal.App.3d 512, 517 [114 Cal.Rptr. 166].) Such an act "must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action." (*People v. Kipp* (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; accord, *People v. Toledo* (2001) 26 Cal.4th 221, 230 [109 Cal.Rptr.2d 315, 26 P.3d 1051].)[17] The presence of handcuff keys in defendant's cell showed, at most, mere preparation. There was no evidence of an actual escape attempt, or any other crime related to the keys. Accordingly, the court abused its discretion by admitting the evidence of handcuff key possession.[18]

### c. *Prejudice*

The error is reversible if there is a reasonable possibility it affected the verdict. This standard is essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Given the insignificant impact of the handcuff key evidence as a demonstration of conduct

---

[17] "Although an attempt to escape is made punishable under Penal Code section 4532 and not under Penal Code section 664 (*People v. Siegel* [(1961)] 198 Cal.App.2d 676 [18 Cal.Rptr. 268]; *People v. Diaz* [(1962)] 208 Cal.App.2d 41, 51 [24 Cal.Rptr. 887]), the general section which prescribes punishment for an attempt to commit a crime where no provision for punishment is otherwise made, the essential elements of an attempt to commit a crime, so as to make the attempt itself punishable, are present in an attempt to escape as well as in those attempts made punishable under Penal Code section 664." (*People v. Gallegos, supra,* 39 Cal.App.3d at p. 516.)

[18] Defendant's claim of instructional error is imperfectly stated, but we note that the court did indeed err by instructing the jury that it could consider handcuff key possession as evidence of conduct involving the implied threat of violence. The court is not *required* to give instructions on the identity or elements of criminal activity introduced under Penal Code section 190.3, but if it does it must instruct the jury accurately. (*People v. Hughes, supra,* 27 Cal.4th at p. 383.) Here, as in *Hughes,* the court erroneously instructed the jury that it could consider conduct that was not a crime. (*Ibid.*)

We need not consider defendant's other arguments regarding the handcuff key evidence. As discussed next, no prejudice resulted from the trial court's ruling.

involving a threat of violence, the minimal role it played in the prosecutor's argument, and the other compelling evidence presented during the penalty phase, we are satisfied beyond a reasonable doubt that the error was harmless.

Defendant contends reversal is required because the prosecutor was permitted to argue that he posed a threat of violence if he escaped from his handcuffs; the handcuff key evidence tended to undercut the notion that his possession of a shank in jail was for purposes of his own protection; and the evidence of his other criminal conduct did not establish a persistent pattern of escalating violence and was not so overwhelming as to render the error harmless. These arguments do not persuade.

We have noted that escape evidence may be particularly prejudicial if used to suggest to the jury that the death penalty is the only means of protecting the public from a defendant who poses a significant escape risk. (*People v. Jackson, supra,* 13 Cal.4th at pp. 1232–1233.) Here, however, the prosecutor made no such insinuation. Her argument on the point was almost perfunctory. She contended that the "jail-made keys" found in defendant's cell showed some sophistication on his part, and noted the testimony that inmates do get out of their handcuffs. She then said: "Why would the defendant need to get out of handcuffs? Under this, ladies and gentlemen, you can show evidence of threat of violence. If he gets out of those handcuffs, there's a threat of violence, there is a threat of escape, and you can take that into consideration." Later, she briefly mentioned the keys and the shank, and stated: "There are people in custody that don't deserve the death penalty at the hands of this defendant." The prosecutor did not mention the keys at all in her rebuttal argument.

The threat posed by defendant's possession of handcuff keys was not a major part of the prosecutor's penalty phase case. Much more direct and graphic evidence of defendant's violent conduct was before the jury. As a teenager, he brutally raped a nine-year-old girl. The victim testified, describing the crime and its dramatic impact on her life. Defendant and an accomplice had surprised another witness inside her home, bound and gagged her, stole her car and other items, and left her tied to a mattress. The testimony about the handcuff keys, and the implied threat of violence arising from their possession, paled in comparison to this testimony relating defendant's actual violent behavior, and to the evidence of Taylor's kidnapping and murder.

Nor does the record reflect that the handcuff key evidence had a significant impact on defendant's explanation for possessing a shank in jail. The keys were discovered months after the shank was confiscated. The deputy who found the shank testified on cross-examination that defendant had told him it

"was for his protection," but defense counsel did not mention this testimony in his closing argument. Instead, he noted that defendant had not hurt anyone while in custody.

Considered in light of the record as whole, the erroneously admitted handcuff key evidence was trivial. There is no reasonable possibility that it affected the penalty verdict.

### 2. *Taylor's Opinion on the Death Penalty*

Defense counsel's proposed penalty phase witnesses included two persons he described as Taylor's friends and fellow activists. They had approached counsel and asked to testify about Taylor's opposition to the death penalty. Defense counsel contended this evidence was admissible under Penal Code section 190.3, factor (k), which permits the jury to take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." He argued that Taylor's view on the death penalty was highly relevant to the jury's determination. According to counsel, Taylor was closer to his fellow activists than he was to his family, who would be testifying for the prosecution. Counsel said it would be the "ultimate irony" for his client to be executed for killing someone who had made it his life's work to oppose the death penalty. He proffered two exhibits: a press release prepared by an activist organization announcing the witnesses' intention to testify on defendant's behalf, and a tape recording of various statements made by Taylor.[19]

The court excluded this evidence, concluding that Taylor's views were not a relevant mitigating factor, because they did not pertain to defendant's character or the circumstances of the crime. The court also deemed the evidence unduly prejudicial.

Nevertheless, Taylor's views were briefly reflected in the testimony of one witness. Reverend Richard Byrd testified that he knew both Taylor and defendant. He had worked with Taylor at KPFK, and joined in Taylor's efforts to start an unlicensed radio station. Both men had both taken an interest in the Mumia Abu-Jamal case. Counsel asked him if "one of

---

[19] The proffered evidence actually fell well short of establishing Taylor's opposition to capital punishment as a matter of principle. The press release noted only that he opposed the death penalty in the Pennsylvania case of Mumia Abu-Jamal. The transcript of Taylor's statements included many declarations supporting Jamal, but none opposing capital punishment in general. Defendant's own testimony at the penalty phase indicated that Taylor was primarily concerned with Jamal's case. Defendant stated: "Them people that spoke up about Michael Taylor, most of them didn't even know nothing about Michael Taylor. He wasn't fighting for Mumia Abu Jamal's freedom point blank for the death penalty [*sic*]. He was fighting against it because the man was wrongfully convicted."

[Taylor's] causes was opposition to certain things, the death penalty, things of that nature?" The witness answered, "indeed." When asked if this stance made Taylor controversial, he replied "very much so."

The prosecutor asked the court to bar defense counsel from arguing Taylor's death penalty opinions. The court granted this request, noting that despite the court's ruling defense counsel had "snuck [the evidence] in." The court conceded that there was "some fairness" in allowing the jury to be informed on this point, but admonished counsel not to argue it.

Defendant contends the exclusion of this evidence was error. He acknowledges that in *People v. Smith* (2003) 30 Cal.4th 581 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*), this court affirmed a ruling barring one of the defendant's victims from testifying that she did not believe the death penalty was appropriate. Defendant attempts to distinguish *Smith* on several grounds, none of which is persuasive.

In *Smith*, evidence of the defendant's numerous assaults against women, including rapes, was presented during the penalty phase as evidence in aggravation. (*Smith, supra*, 30 Cal.4th at pp. 599–600.) The defense obtained a protective order barring the prosecution from asking the victims of these crimes for their opinions on the appropriate punishment. As it happened, however, one of the victims was opposed to the death penalty and refused to testify unless she could express her view on the defendant's punishment. Over the defendant's objection, the trial court ruled that the victim's opinion was inadmissible. (*Id.* at p. 622.)

As we stated in *Smith*: "It is clear that the *prosecution* may not elicit the views of a victim or victim's family as to the proper punishment. (*Booth v. Maryland* (1987) 482 U.S. 496, 508–509 [96 L.Ed.2d 440, 107 S.Ct. 2529].) The high court overruled *Booth* in part, but it left intact its holding that 'the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment.' (*Payne v. Tennessee* [(1991)] 501 U.S. [808,] 830, fn. 2 [115 L.Ed.2d 720, 111 S.Ct. 2597].) That court has never suggested that the defendant must be permitted to do what the prosecution may not do. The views of a crime victim . . . regarding the proper punishment has no bearing on the defendant's character or record or any circumstance of the offense. (*Skipper v. South Carolina* [(1986)] 476 U.S. [1,] 4 [90 L.Ed.2d 1, 106 S.Ct. 1669].) Hence, the Eighth Amendment to the United States Constitution does not compel admission of those views. (*Robison v. Maynard* (10th Cir. 1991) 943 F.2d 1216, 1216–1217 [even after *Payne v. Tennessee, supra,* 501 U.S. 808, 'testimony from a victim's relative that she did not want the jury to impose the death penalty was improper mitigating evidence and inadmissible at the penalty phase hearing'].)

"Citing [Penal Code] section 190.3 and the United States Constitution, we have held that testimony from somebody 'with whom defendant assertedly had a significant relationship, that defendant deserves to live, is proper mitigating evidence as "indirect evidence of the defendant's character." ' (*People v. Ervin* (2000) 22 Cal.4th 48, 102 [91 Cal.Rptr.2d 623, 990 P.2d 506]; see also *People v. Mickle* (1991) 54 Cal.3d 140, 194 [284 Cal.Rptr. 511, 814 P.2d 290]; *People v. Heishman* (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].) This evidence is admitted, not because the person's opinion is itself significant, but because it provides insights into the defendant's character. (*People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442].)" (*Smith, supra*, 30 Cal.4th at pp. 622–623, original italics.) The *Smith* court concluded that the victim's testimony was inadmissible because she had no relationship with the defendant other than being his rape victim. (*Id.* at p. 623.)

Defendant argues that, unlike the victim in *Smith*, he had a significant working relationship with Taylor in the months preceding the murder, involving their social activism and including opposition to the death penalty. He contends that admission of Taylor's view on capital punishment would have provided "insights into an altruistic quality of [defendant's] character." The argument fails. As noted in *Smith*, testimony from persons who know a defendant and wish his life to be spared is admissible as evidence of the defendant's character. Defendant, of course, could not provide testimony regarding Taylor's opinion on whether *defendant* deserved to live. Taylor's opposition to the death penalty as a matter of principle, if indeed it could have been established (see fn. 19, *ante*, at p. 96), was not evidence of defendant's character. If Taylor's asserted view on this subject cast any reflection on defendant it was not a complimentary one. It would have shown that defendant was willing to kill a fellow activist over disputed radio equipment, despite their purported stand against the death penalty.

 Defendant also claims that evidence of Taylor's opinion should have been admitted to rebut the testimony of Taylor's mother, brother, and daughter, who spoke of the effects his killing had on the family. Defendant notes that such "victim impact" testimony was admissible as a "circumstance of the crime of which [he] was convicted." (Pen. Code, § 190.3, factor (a); see *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353].) He argues that Taylor's opinion was a similar "circumstance of the crime." Rebuttal evidence, however, must relate to the subject matter of the opponent's evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 579 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) Defendant fails to explain how evidence of Taylor's views on the death penalty would have operated to rebut his family members' testimony about the loss of their loved one. He merely repeats his contention that Taylor's views would have illuminated the "better angels" of

defendant's character. There is no material, logical, or moral connection between the effects of defendant's crime on the victim's family and the victim's views on capital punishment, whatever they may have been, and to whatever extent they were shared by defendant. (Cf. *People v. Edwards, supra,* 54 Cal.3d at p. 833.)

Finally, defendant asserts that the evidence was admissible under Penal Code section 190.3, factor (k), as a "circumstance which extenuate[d] the gravity of the crime even though it [was] not a legal excuse for the crime." He suggests that Taylor's own choice to "embrace mercy and compassion" was a mitigating circumstance the jury should have been allowed to consider. This claim also lacks merit. The gravity of defendant's crime was not extenuated by his victim's idealism.

The evidence of Taylor's opinion on the death penalty was properly excluded.

### 3. *Claims Regarding Defendant's Testimony*

Defendant raises four arguments related to his testimony at the penalty phase. He contends the trial court failed to adequately advise him of the limited scope of his testimony and the potential pitfalls of testifying; erroneously limited the scope of his testimony; improperly overruled defense objections to the scope of cross-examination; and unfairly required defendant to testify before his psychologist had finished testifying. None of these claims is meritorious.

### a. *Failure to Advise*

At the beginning of the penalty phase, defense counsel told the court that, against his advice, defendant wanted to testify. Counsel said he assumed defendant had that right, just as at the guilt phase.[20] The following exchange ensued:

"The Court: It's equally or more important in the penalty phase that he has a right to testify.

"[Defense Counsel]: If he does, I'd like the admonition from the court that he's doing it without my advice and in direct contravention to what I think would be my position on him doing that, but he has an absolute right to do it if he wants to.

---

[20] Defendant had accepted counsel's advice not to testify at the guilt phase.

"The Court: Okay. Well, you've advised him now on the record.

"And again, Mr. Lancaster, that's your personal choice to make. No one can prevent you from testifying. At the end of the case I'll check to make sure if you haven't testified whether or not you want to testify."

The court added, "This is a more personal decision on your part than it is during the guilt phase, because one advantage to testifying is obviously that they know you as a person instead of somebody that's just been sitting there.

"But your attorney has given you contrary advice, and you've got to consider both sides in making your personal decision."

Defendant decided to testify. He now contends the court's advisement was inadequate and misleading, because the court did not admonish him about the risks of testifying, failed to revisit the matter immediately before defendant took the stand, held no hearing to explore defendant's disagreement with counsel over the decision, and did not warn him that the scope of his testimony would be limited. The court was not required to do any of those things.

Defendant relies on *People v. Nakahara* (2003) 30 Cal.4th 705 [134 Cal.Rptr.2d 223, 68 P.3d 1190], and *People v. Guzman* (1988) 45 Cal.3d 915 [248 Cal.Rptr. 467, 755 P.2d 917], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]. These cases are inapposite. The *Nakahara* trial court gave the admonishments and held the hearing that defendant claims he should have received. Nakahara complained that the court did not sufficiently protect his right to counsel and failed to caution him against testifying in narrative fashion. This court concluded the court's admonishments were adequate, but did *not* hold they were required. (*People v. Nakahara, supra,* 30 Cal.4th at p. 717.) The *Guzman* trial court gave a more extensive set of warnings, but Guzman faulted his counsel for forcing him to testify in narrative fashion, and the court for not telling him that the jury was likely to infer he was lying. We rejected these arguments. (*People v. Guzman, supra,* 45 Cal.3d at pp. 942, 946.) However, as the *Nakahara* court noted, "nowhere in our *Guzman* opinion did we suggest that such an array of admonishments was a necessary or constitutional prerequisite to receiving a defendant's testimony against advice of counsel." (*People v. Nakahara, supra,* 30 Cal.4th at p. 717.)

 A defendant has a fundamental right to testify on his own behalf. (*People v. Nakahara, supra,* 30 Cal.4th at p. 717; see *Rock v. Arkansas* (1987) 483 U.S. 44, 49–53 [97 L.Ed.2d 37, 107 S.Ct. 2704].) "[A] defendant may be allowed to exercise, or not to exercise, the right to testify, without advisement

by the trial court . . . ." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1223 [131 Cal.Rptr.2d 499, 64 P.3d 788].) Defendant refers us to no authority requiring an admonition in this situation. Indeed, he cites cases holding that the court should not interfere with the defendant's decision. (*United States v. Teague* (11th Cir. 1992) 953 F.2d 1525, 1533, fn. 8; *United States v. Campione* (7th Cir. 1991) 942 F.2d 429, 439; *United States v. Martinez* (9th Cir. 1989) 883 F.2d 750, 757, vacated on another ground (9th Cir. 1991) 928 F.2d 1470.) Defendant suggests the court's comments in this case improperly encouraged him to testify. Not so. The court's brief observation that there was an advantage to testifying at the penalty phase was balanced by its advice that defendant should consider his attorney's contrary view.

#### b. *Limitations on the Testimony*

Defendant embarked on his narrative testimony by claiming the accusations against him were false, and based on testimony that was "bought" by the prosecution. He then referred to Taylor's advocacy on behalf of Mumia Abu-Jamal, and attempted to draw a parallel between Jamal's case and his own, as follows:

"[T]he man was wrongfully convicted by a jury. The police said he killed somebody in Philadelphia. The police said this. Just like in this case the prosecution lied, intimidated witness [*sic*] to testify against me, yeah, to convict him. They put his fingerprints on the gun—" The prosecutor objected at this point, claiming the testimony was irrelevant. The court sustained the objection. A little later, defendant described his experience in prison after a previous conviction, and attempted to connect it with other cases. "They tried to dope me up with medication. Didn't work. Whenever a black man talks about revolution or up rising or fighting for his own rights, they label him crazy. That's what they did to Mumia Abu-Jamal. That's their excuse. There ain't no excuse for that. They do it to Ron, Huey P. Newton. They experiment on black people." Again, the court sustained a relevance objection.

Defendant argues first that the court erroneously barred him from expressing his view that the prosecutor had manipulated and bribed the witnesses against him. This claim is not supported by the record; defendant's testimony regarding the conduct of his own prosecution was neither objected to nor excluded. The court sustained objections only to his statements regarding other cases. Defendant also contends those statements should have been admitted, because they demonstrated his "political awareness and aspiration to fight against racial discrimination" and his "own view of himself and his place in the world."

Defendant relies on *People v. Webb* (1993) 6 Cal.4th 494 [24 Cal.Rptr.2d 779, 862 P.2d 779], for the proposition that "a defendant's

absolute right to testify cannot be foreclosed or censored based on content." (*Id.* at p. 535.) That statement must be understood in context; it addressed Webb's contention that the trial court should not have allowed him to testify in favor of a death sentence. The relevance of the testimony was not challenged. It is beyond cavil that evidence presented in mitigation must be relevant to the defendant's character and prior record, or the circumstances of the charged offense. (E.g., *People v. Zapien* (1993) 4 Cal.4th 929, 988–989 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *Kansas v. Marsh* (2006) 548 U.S. 163 [165 L.Ed.2d 429, 126 S.Ct. 2516, 2525].) "Evidence of third persons' having been wrongfully convicted of capital offenses is irrelevant to the jury's function in the case before them and is therefore inadmissible. [Citations]." (*People v. Alcala* (1993) 4 Cal.4th 742, 807 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Testimony that other prisoners had been "label[led] crazy" and "experiment[ed]" upon was similarly irrelevant to defendant's character, record, and the circumstances of his offense.

Defendant claims his counsel explained to the court that his client was about to discuss the relevant topic of why the radio station was being started, but his testimony was nevertheless precluded. However, the record discloses no such explanation during defendant's direct testimony, and in any event defendant was permitted to testify about the radio station without objection.

#### c. *The Scope of Cross-examination*

Over objection, the prosecutor cross-examined defendant about his statements to the police shortly before and after his arrest. Defendant contends the scope of this examination exceeded that of his direct testimony. He also claims it was unfair to use this evidence because he had no access to the tapes or transcripts of the statements before he took the stand.

"It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination." (*People v. Farnam* (2002) 28 Cal.4th 107, 187 [121 Cal.Rptr.2d 106, 47 P.3d 988].) The court did not abuse its discretion here. Defendant testified that the witnesses against him had been bribed, that it was a lie to say he had killed Taylor, and that he would not "cop to something I didn't do." The prosecutor's cross-examination was properly directed at defendant's taped statements about the witnesses, and his responses to police questioning about the crime and the evidence. Defendant was allowed to refresh his memory by reading the transcript when he had difficulty remembering the interviews. He fails to establish any impropriety in the cross-examination.

#### d. *Sequence of the Testimony*

During a discussion regarding the scheduling of witnesses, defense counsel told the court that "my whole penalty phase has been set up predicated on

having Dr. Romanoff testify first, and he won't be available until tomorrow." Counsel did call Dr. Romanoff as his first witness the next morning. After the direct examination was completed, however, counsel reported that the doctor had changed his schedule to appear that morning, a Friday, but was leaving for a camping trip in the afternoon. Counsel was concerned that this would not leave the prosecutor enough time to complete her cross-examination. The doctor would be available again on Monday. The court extended the Friday morning session until 12:30, but the prosecutor indicated she would need to continue with the doctor on Monday.

Reluctant to "wast[e] half a day," the court inquired whether defendant had decided to testify. Counsel replied: "He's told me he still wants to. The only reason I am so accommodating of Dr. Romanoff is he has been incredibly accommodating to me, to the court, as you know. He came in to the court, he's been in jail several times, he's had problems with Mr. Lancaster being reticent. He's gone there at times when he's refused to see him, and he's gone through all of that and he's been very patient. Any latitude that he wants, I think he's entitled to. That's the only reason I would ask." The prosecutor had no objection to continuing her questioning on Monday. Defendant testified on Friday afternoon.

Defendant contends he was denied the right to make a fully informed decision whether to testify at the close of the defense case. He cites *Brooks v. Tennessee* (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891], in which the court declared unconstitutional a statute requiring criminal defendants to testify before any other defense witness. The court held that the statute impermissibly deprived defendants of the ability to assess the testimony of other defense witnesses before deciding whether to testify and risk cross-examination. (*Id.* at pp. 609–612.) The court further held that the statute violated the defendants' due process right to the advice of counsel, by requiring counsel to make an important tactical decision without the opportunity to evaluate the testimony of the other defense witnesses. (*Id.* at pp. 612–613.)

*Brooks* does not support defendant's claim. It did not arise from the penalty phase of a capital trial. Moreover, defendant was not forced to testify first. The court granted his counsel's request to permit Dr. Romanoff to leave before the doctor's cross-examination could be completed. This is not a case like *People v. Cuccia* (2002) 97 Cal.App.4th 785 [118 Cal.Rptr.2d 668], in which the court effectively compelled the defendant to take the stand by threatening to consider his case completed after a defense witness failed to appear. (*Id.* at pp. 790–791.) Here, the court merely exercised its discretion to regulate the order of proof (Evid. Code, § 320) in response to defense counsel's desire to accommodate a witness's vacation plans. The *Brooks*

court noted that its holding did not "curtail[] in any way the ordinary power of a trial judge to set the order of proof." (*Brooks v. Tennessee, supra,* 406 U.S. at p. 613.)

### 4. Admission of the Taped Statements

Before Dr. Romanoff began his testimony, defense counsel objected to the prosecutor's plan to play the tapes of defendant's statements to the police around the time of his arrest. He claimed the prosecutor's only purpose was to show that defendant was a liar, which counsel was willing to concede. The prosecutor said she had provided the doctor with copies of the statements and asked him to listen to the tapes. She wanted to use them to rebut any suggestion by Dr. Romanoff that defendant was "more of a follower," to show that he was a habitual liar, and to demonstrate why he may have refused to answer some of the doctor's questions. Defense counsel argued that it was improper at this point in the trial to bring up defendant's lies to the police. The court overruled the objection, observing that the tapes might be relevant either to impeach the doctor's testimony or to explore whether his opinion might change based on the tapes. It invited counsel to revisit the matter before Dr. Romanoff's cross-examination.

The parties did so during a break in the doctor's direct testimony. The prosecutor said she intended to play the tapes in their entirety. Defense counsel vigorously objected, claiming the prosecutor was simply trying to prejudice his client by demonstrating unpleasant aspects of his character. At counsel's urging, the court reviewed the transcripts of the tapes before ruling. It observed that the tapes covered many subjects, and asked the prosecutor why they needed to be played. The prosecutor said they supported her theory that defendant was a habitual liar, who was likely to have lied to the doctor, and who may have tried to use the doctor to find "a new way out." The court accepted this explanation and overruled the objection.

The prosecutor did not introduce the tapes into evidence until Dr. Romanoff returned to the stand on Monday. During her cross-examination of defendant on Friday afternoon, however, the prosecutor questioned defendant at length about the taped statements. During a break in this cross-examination, defense counsel asked the court to exclude one particular statement: when asked what he was doing the night Taylor was murdered, defendant had replied, "I fuck the shit out of my wife like I do every night." Counsel argued that this statement had little evidentiary value and was unduly inflammatory. The prosecutor responded that it was part of defendant's alibi. The court overruled the objection. It noted that some prejudice was created by the way defendant expressed himself, but decided the statement was "more probative than prejudicial." Nevertheless, when the prosecutor questioned defendant about

his statements regarding his whereabouts on the night of Taylor's murder, she did not mention the statement to which defense counsel had objected.

On Monday, before Dr. Romanoff's cross-examination resumed, counsel raised a final objection to the tapes. Again, he conceded that defendant made many "misstatements of fact," and contended the tapes were unduly prejudicial. The prosecutor submitted the matter, noting that defendant had opened the door to the admission of his statements by taking the stand and discussing the crime. The court again overruled the objection, observing that the statements were admissible regarding both the offense itself and the doctor's opinion. Dr. Romanoff testified that he had listened to the tapes, but only after he completed his report. He said they were consistent with his view of defendant. After the tapes were played, the prosecutor asked the doctor only a few questions and did not address defendant's alibi.

Defendant contends the trial court committed prejudicial error by allowing the tapes to be played without excluding his alibi statement regarding marital sex. He argues that this statement did not fall within any permissible category of aggravating evidence, because the acts involved were not criminal and did not tend to prove any factor listed in Penal Code section 190.3. He claims his statement merely portrayed him in an unpleasant way, and asserts that its prejudicial impact outweighed any value it may have had in assessing Dr. Romanoff's conclusions.

These arguments are meritless. In the first place, defendant did not ask the court to redact the marital sex alibi before playing the tapes; he specifically objected to the admission of that statement only during his own cross-examination. Although the objection was unsuccessful, the prosecutor refrained from bringing up the sexual aspect of the alibi during her questioning. Furthermore, by testifying and asserting his innocence, defendant placed at issue his statements regarding the circumstances of the crime. The alibi evidence was not offered in aggravation, but to impeach both defendant and Dr. Romanoff. A trial court has broad latitude to weigh the prejudicial impact of a defendant's statement against its probative value. (*People v. Robinson* (2005) 37 Cal.4th 592, 625–626 [36 Cal.Rptr.3d 760, 124 P.3d 363].) Furthermore, it is well settled that the scope of cross-examination of an expert witness is especially broad; a prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion. (*People v. Wilson* (2005) 36 Cal.4th 309, 358–359 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Dennis* (1998) 17 Cal.4th 468, 519 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Nye* (1969) 71 Cal.2d 356, 374–375 [78 Cal.Rptr. 467, 455 P.2d 395].)

### 5. *The Statement About the Robbery*

In connection with the prior home invasion robbery defendant committed with an accomplice, the prosecutor unsuccessfully solicited a statement made after the two were arrested. An officer transporting defendant and his accomplice to juvenile hall testified that she overheard a conversation between the suspects in the backseat of the patrol car. The officer stated that the two were laughing, and one of them (she was not sure which) said "the bitch deserved it because she left her door open." Defense counsel promptly moved to strike this testimony. The court sustained the objection and struck the answer. Subsequently, the court sustained counsel's objection to the entire line of questioning. The jury was later instructed not to consider any evidence that was stricken by the court.

Defendant contends the trial court erred by failing to instruct the jury more specifically to disregard the stricken testimony. He provides no authority to support this argument, and in any event his claim of prejudice is manifestly meritless. The stricken testimony did not establish that it was defendant who made the comment in question, and the comment itself was not particularly prejudicial, compared to the other evidence in aggravation.

### 6. *Standard of Proof for Aggravating Factors*

Defendant argues that the jury should have been instructed to make its findings on all aggravating factors unanimously, and by the standard of beyond a reasonable doubt. He contends such an instruction is required under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2000) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. We have repeatedly rejected this argument, and do so again here. (E.g., *People v. Jurado* (2006) 38 Cal.4th 72, 143 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Cornwell, supra,* 37 Cal.4th 50, 104; *People v. Morrison, supra,* 34 Cal.4th 698, 730–731.)

In his reply brief, defendant refers to the high court's more recent decision in *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]. He does not, however, argue that *Booker* adds anything to the analysis; he merely notes that it reaffirmed the holding in *Apprendi.* (*Booker, supra,* 543 U.S. at p. 244.) Thus, defendant provides us with no reason to reconsider our earlier holdings on this point.

### 7. *Denial of Modification*

Defendant's final argument has been filed under seal. He contends that, in ruling on the application for modification of his death sentence (Pen. Code,

§ 190.4, subd. (e)), the court improperly relied on evidence he had no opportunity to deny or explain, in violation of *Gardner v. Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197]. He bases this claim on sealed transcripts of two hearings. At a July 16, 1996 hearing, the prosecutor appeared ex parte and explained to the court why she had not given defendant, then representing himself, certain discovery materials. The trial judge did not preside at this hearing. At a May 29, 1997 hearing, held before the trial judge, counsel for Rodriguez and Alexander appeared ex parte seeking access to defendant's confidential prison medical records. Rodriguez and Alexander were then codefendants; counsel wanted to show that they were coerced or intimidated by defendant. The request was denied.

Defendant argues that he was cast in a very damaging light at these hearings, and claims the trial court must have considered the allegations about his character made by counsel when it refused to modify his sentence. He notes that counsel's comments portrayed him as a member of a Black paramilitary group, an "executioner," and a threatening figure who coerced his accomplices and attempted to intimidate witnesses. He contends the court's findings at the modification hearing that Alexander and Rodriguez were "clear followers," that Alexander was "slow-witted," and that both were "easily led" by defendant, who was "very smart," were tainted by information disclosed at the ex parte hearings. However, the court expressly referred to the trial testimony of Alexander and Rodriguez, and its notes on that testimony, when it made its findings. It is highly unlikely that the court would have considered remarks made by counsel at brief pretrial hearings, one held over two years earlier before a different judge and the other held over a year previously, when it had just heard the extensive testimony at trial, including defendant's own.

We have reviewed the sealed transcripts, and the trial court's detailed statement of its reasons for denying modification. As in *People v. Sakarias* (2000) 22 Cal.4th 596, 649 [94 Cal.Rptr.2d 17, 995 P.2d 152], the record "provides not the slightest reason to suppose the trial court here relied on or considered" the information defendant complains about. When the court makes no mention of improper material when denying modification, we will not conclude there was any improper influence. (*People v. Kipp, supra*, 18 Cal.4th at p. 383.)[21]

---

[21] Defendant notes that at the May 29, 1997 hearing, Alexander's counsel referred to "an earlier declaration of some of my client's background." In a footnote to his brief, he asks us to unseal this declaration in case it might bolster his showing. Even if defendant had complied with the procedural requirements for unsealing a record (Cal. Rules of Court, rule 8.160(f)), it is inconceivable that this item would assist him. As stated above, the court expressly based its findings on Alexander's trial testimony. We deny the request.

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 18, 2007.